[No. F048751. Fifth Dist. Apr. 7, 2006.]

In re J.N., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
S.N., Defendant and Appellant.

453

COUNSELCOUNSEL

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, County Counsel, and Susan M. Gill, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

GOMES, J.—Appellant S.N. (mother) appeals from the juvenile court's order denying her telephone visitation with her son J. Mother contends the court erred in denying her telephone visitation and failing to ask her whether she had any Indian heritage, as required for purposes of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). While we will find the court did not abuse its discretion in denying visitation, we agree the court erred in failing to ask mother about her Indian heritage. Accordingly, we will remand the matter with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 24, 2005, the Kern County Department of Human Services (the Department) filed a petition alleging that then 10-year-old J., who was living with his maternal grandparents, came within the court's jurisdiction pursuant to Welfare and Institutions Code section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage) and (i) (cruelty).[1] It was alleged that J.'s father (father) failed to provide J. with adequate food, clothing, shelter or medical treatment, as father refused to allow J. to reside in his home and instead J. lived with his maternal grandparents in a filthy, roach-infested home, which smelled of urine, and he had been locked in a bedroom and forced to urinate in a coffee can. It was further alleged J. had suffered, or there was a substantial risk he would suffer, serious physical harm as a result of father's failure or inability to adequately supervise or protect J. from the actions of J.'s maternal grandparents as (1) his grandfather spanked J. with a nylon strap on the buttocks and legs, grabbed J. by his arm, resulting in two bruises, and stuffed a T-shirt in J.'s mouth to prevent him from crying; (2) J. had been locked in a bedroom and forced to urinate in a coffee can while in J.M.'s care; and (3) J. was left for long periods of time with his grandmother, P.M., who had suffered a stroke and was legally blind. The petition also alleged J. suffered serious emotional damage evidenced by severe anxiety, depression, or

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

withdrawal, as J. cut himself as a result of father's refusal or unwillingness to provide care for J. or to allow him to reside in his home.

In May 1996, when J. was nearly 20 months old, he was the subject of a dependency proceeding following the death of his three-year-old sister S. At that time J. and S. were living with their four-year-old sister P., mother and her boyfriend. On May 7, 1996, a petition was filed on behalf of J. and P., alleging: (1) mother's substance abuse impaired her ability to protect the children as she allowed her boyfriend to physically abuse them; (2) mother and her boyfriend subjected the children to acts of cruelty, as the children were held under cold running water for extended periods of time; (3) mother reversed the lock on P.'s bedroom door, locking her in the room with no way out; (4) S. died as a result of severe physical abuse by mother and her boyfriend; (5) P. had numerous contusions and lacerations all over her body, which either mother, or her boyfriend with mother's knowledge, caused; and (6) father used controlled substances, was in drug rehabilitation and could not provide care for the children. The allegations were sustained and family reunification services ordered for father, while mother was denied family reunification services. The court ordered no contact between mother and the children, although she was allowed to maintain contact through correspondence with the Department.

In October 1996, mother pled no contest to willful cruelty to a child and voluntary manslaughter and was sentenced to 12 years in state prison. Father received reunification services until June 1997, when the children were placed with him. Father then received family maintenance services until November 1998, when dependency proceedings were dismissed.

About two years before the instant petition was filed, father took J. to his maternal grandparents' home to live. Prior to that time, J. and P. stayed with their grandparents over weekends, as their father worked odd hours. Before the detention hearing, father told the social worker he would not be interested in having J. released to him at this time because J. had extreme behavioral problems; he pulled knives out on his sister and did not behave properly at home while in father's care. Father admitted he could not handle his son. They had gone through counseling and tried medication, but nothing seemed to work. J. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and was taking Ritalin. J. was also taking Adderal and Risperidol for the ADHD and was receiving services from Kern County Mental Health.

When the petition was filed in the instant case, mother was still incarcerated. She had not seen J. in nine years, although she had spoken to him

weekly, by telephone, since he had been living with her parents.[2] According to mother, J. did not visit her during her incarceration because the juvenile court made a no-contact order when J. was previously a dependent. Mother expected to be released from prison on November 2, 2006, after serving 10 years, six months of her sentence. During her incarceration, she participated in parenting, substance abuse, victim impact self-awareness, narcotics anonymous and mental health groups focusing on domestic violence. Mother claimed there was domestic violence during her relationship with father, that she started divorce proceedings in June 1995, and the divorce was finalized in June 2000.

At the June 27, 2005, detention hearing, the court ordered J. detained and placed him in foster care. Father was given supervised visitation of one hour per week, at J.'s discretion. The court did not specifically address visitation for mother at this hearing, although the minute order states that if the "parent(s)" are incarcerated, visits are to occur monthly for one hour. Mother was not present at the hearing.

Sometime after the detention hearing, J. told the social worker that he wanted to live with his father. The social worker asked J. about an incident that occurred at the children's center on the day of the detention hearing, in which J. told a worker there that he tried to cut himself, that he didn't like himself and he wanted to die, and he hated his father for abandoning him. J. admitted there were several incidents where he had attempted to cut himself because he didn't like his life, and said his life would be better if he lived with his father. J. had not seen his sister in a year, but wanted to visit her.

On August 8, 2005, a mediation was held in which the parties agreed there were no allegations against mother, the Department agreed to offer father family reunification services, and father agreed to participate in those services.[3] Father decided to contest the jurisdictional allegations and mother requested visitation.

A combined jurisdiction and disposition hearing was held on August 15, 2005. The Department dismissed two of the allegations in the petition pertaining to serious emotional damage and cruelty, leaving three allegations of failure to protect, one allegation of serious emotional damage, and one allegation of cruelty. The father submitted on jurisdiction, and the court sustained the petition's allegations as amended.

---

[2] J.'s grandfather, J.M., told the social worker that while J. lived with him he spoke to mother "almost every week" and "[t]he conversations were 'sometimes' monitored."

[3] Before the mediation, father again told the social worker he was not interested in receiving family reunification services because he couldn't handle J. The social worker advised father the only other plan would be long-term foster care.

The social study initially prepared for the dispositional hearing recommended weekly one-hour visits between J. and his father, at J.'s discretion, and no visits between J. and mother, "as the mother is incarcerated at Central California Women's Facility as the result of the death of the child's sibling." In a supplemental social study, prepared after father decided to request family reunification services, the Department recommended family reunification services for father, but none for mother, as there was clear and convincing evidence J. came within section 361.5, subdivision (b)(4), since mother caused the death of another child through abuse or neglect. The Department further recommended supervised weekly two-hour visits between J. and father, and that J. have no contact with mother, as such contact was not in his best interest.

At the dispositional hearing, father submitted on the supplemental report. Father's attorney, who specially appeared for mother's attorney at the hearing, stated mother's attorney requested mother "be allowed to have some phone contact" with J., but father "would oppose that." J.'s attorney responded that she did not know what kind of contact mother has had with J. over the last number of years, that she thought mother had been in custody for many years in regard to the death of another child, "[a]nd we are going to have a problem getting phone contact because that means someone in prison would have to call directly to a foster parent's home and most foster parents don't want their phone numbers given out to prisons. [¶] I would indicate to the Court that while the child was with grandfather, the child was removed from mother indicating that she had weekly phone contact with her son." The court responded that "[i]t would be difficult to address the issue" and the court could understand the caretaker's reluctance to provide phone numbers. J.'s attorney stated: "I just don't know if something like this would work out; but in prison you can't call anytime you want and special too. You have to have a specific time. You have to have a situation where the child was at [the Department] at a specific time on a specific day and Mom calls collect. I don't know if that can all be juggled."

The court proceeded to order reunification services for father, denied services for mother pursuant to section 361.5, subdivision (b)(4), ordered supervised visits for father, and ordered J. "not to have any contact with the mother as that is not in the best interest of that child." Mother filed a timely notice of appeal from the court's no-contact order.

## DISCUSSION

### A. *Visitation*

■ Section 361.5, subdivision (e)(1) provides that if a parent is incarcerated, the court shall order reasonable services unless the court

determines, by clear and convincing evidence, that services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the nature of the crime, and the degree of detriment to the child if services are not offered. Reunification services for an incarcerated parent are subject to the time limitations imposed in section 361.5, subdivision (a), and may include, among others, telephone calls and "[v]isitation services, where appropriate." (§ 361.5, subd. (e)(1).)

Section 361.5, subdivision (f) provides that when a court does not order reunification services to a parent under that paragraph, and either sets a section 366.26 hearing or the other parent is being provided reunification services, "[t]he court *may continue to permit* the parent to visit the child unless it finds that visitation would be detrimental to the child." (§ 361.5, subd. (f), italics added.)

Mother contends the juvenile court applied the wrong standard in denying her request for telephone visitation with J. She argues that section 361.5, subdivision (f) requires the court to evaluate her visitation request under a "detriment to the child" standard, which it must find by clear and convincing evidence, and the court erred by applying a "best interests" standard and not expressly addressing the factors set forth in section 361.5, subdivision (e)(1). We disagree and conclude mother has misread the statute.

As noted above, section 361.5, subdivision (e)(1) states that a juvenile court "shall order" that reasonable reunification services be provided to an incarcerated parent unless it determines that services would be detrimental to the child. Once the juvenile court has denied reunification services under subdivision (e)(1), section 361.5, subdivision (f) gives the court *discretion* to allow the parent to continue visitation with his or her child unless it finds that visitation would be detrimental to the child. In the latter event, subdivision (f) provides that the court does not have discretion to continue to permit visitation. The statute expressly states that when the court does not order reunification services, it "*may continue to permit*" the parent to visit the child unless it finds that visitation would be detrimental. (§ 361.5, subd. (f), italics added.) The statute does not say, as mother suggests, that the court "shall" continue to permit visitation unless it finds that visitation would be detrimental to the child. The term "may" in subdivision (f) does not mean "shall."[4]

---

[4] Absent any indicia of a contrary legislative intent, the word "shall" is ordinarily construed as mandatory, whereas "may" is ordinarily construed as permissive. (*People v. Ledesma* (1997) 16 Cal.4th 90, 95 [65 Cal.Rptr.2d 610, 939 P.2d 1310].) This is especially so where both "shall" and "may" are used in the same statute. (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *In re Richard E.* (1978) 21 Cal.3d 349, 353 [146 Cal.Rptr. 604, 579 P.2d 495].) "[I]t is well settled 'that in attempting to ascertain the

■ Indeed, the Legislature's use of both "shall" and "may" in the same paragraph in section 361.5, subdivision (f) indicates the words have different meanings. Subdivision (f) provides that if the court does not order reunification services at the dispositional hearing, it "shall" determine if a section 366.26 hearing should be set. Subdivision (f) goes on to say that the court "shall not schedule" such a hearing if the other parent is still receiving reunification services. The last sentence of subdivision (f) states that the court "may continue to permit" the parent not receiving services to visit the child unless it finds that visitation would be detrimental to the child. We construe the word "may" in the last sentence of subdivision (f), therefore, as permissive, i.e., as giving the juvenile court discretion to permit or deny visitation when reunification services are not ordered, unless of course it finds that visitation would be detrimental to the child, in which case it must deny visitation.

■ This is a logical distinction. Visitation is an essential part of a reunification plan. "In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, or to encourage or suspend sibling interaction, any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] (1)(A) Subject to subparagraph (B), for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).)
■ Visitation is no less crucial for an incarcerated parent receiving reunification services. (§ 361.5, subd. (e)(1); *In re Dylan T.* (1998) 65 Cal.App.4th 765 [76 Cal.Rptr.2d 684]; *In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1237 [62 Cal.Rptr.2d 208], disapproved on another point in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541]; *In re Brittany S.* (1993) 17 Cal.App.4th 1399 [22 Cal.Rptr.2d 50].) Therefore, when reunification services are being provided, it is error to deny visitation with the parent to whom the services apply unless there is sufficient evidence that visitation would be detrimental to the child. (*In re Dylan T., supra,* 65 Cal.App.4th 765 [denial of visitation improperly based upon minor's age alone]; *In re Jonathan M., supra,* 53 Cal.App.4th 1234 [arbitrary geographical limit of 50 miles insufficient]; *In re Brittany S., supra,* 17 Cal.App.4th 1399 [denial of visitation improper where mother incarcerated only 36 miles distant].) On the other hand, visitation is not integral to the overall plan when

---

legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning.' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 18 [270 Cal.Rptr. 796, 793 P.2d 2].) When the Legislature uses different words in the same statute, we must presume it intended a different meaning. (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348].)

the parent is not participating in the reunification efforts. This reality is reflected in the permissive language of section 361.5, subdivision (f).[5]

■ Further, contrary to mother's contention, section 361.5, subdivision (f) does not dictate a particular standard the juvenile court must apply when exercising its discretion to permit or deny visitation between a child and a parent who has not been receiving reunification services. The Legislature instead has left this determination to the court's discretion for the narrow group of parents described in section 361.5, subdivision (f), who have been denied reunification services at the outset. (Compare § 366.21, subd. (h) [detriment to the child standard applies to visitation requests for parents who have been receiving reunification services].) Here, the juvenile court found it was not in J.'s best interests to allow contact with mother while she was in prison. The best interests of the child is certainly a factor the court can look to in exercising its discretion to permit or deny visitation. (See *In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 569 [283 Cal.Rptr. 483] [the standard which governs all determinations in dependency proceedings is protection of the child's welfare and best interests].)

We are left with the determination of whether the court abused its discretion when it found contact with mother would not be in J.'s best interest. " ' ["]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) The abuse of discretion standard warrants that we apply a very high degree of deference to the decision of the juvenile court. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [93 Cal.Rptr.2d 644].)

■ In the instant case, we find no abuse of discretion. Mother was incarcerated when J. was two years old and has not seen him for nine years. Since J. was removed from mother's custody at such a young age, it reasonably can be inferred that he has not bonded with her and they do not have a strong relationship. Mother certainly has not functioned as a parent to J. for nearly his entire life. The only contact she has had with J. is the weekly telephone visitation with him, presumably for the two years he lived with his grandparents. There is no evidence, however, of the nature of that visitation. We do note that although he apparently was not directly asked his

---

[5] For the first time in her reply brief, mother argues that permitting a court greater discretion to deny visitation to parents who are denied reunification services than for parents who failed reunification efforts violates the equal protection clause. The issue is waived, however, because it was raised for the first time in mother's reply brief. (*In re Tiffany Y.* (1990) 223 Cal.App.3d 298, 302–303 [272 Cal.Rptr. 733].)

views on continued visitation with mother, J. did not request it; instead, he focused on reuniting with his father and sister, with whom he certainly has a bonded relationship.

It is apparent from the record that J. has severe emotional problems and abandonment issues. It is also apparent that it would be logistically difficult to arrange telephone visitation with mother, since J. would need to be brought to the Department's offices to receive the call, and such visitation would be unpredictable, as mother has no control over when she would be able to call J. The court reasonably could conclude that the logistical difficulties of telephone visitation would add to J.'s emotional problems and create even more uncertainty in his life, and therefore would not be in his best interest at that time. On this record, the court's no-contact order is not arbitrary and capricious.

Mother complains the no-contact order prevents her from establishing a relationship with J. that may have led to "other potential avenues [of] reunification." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 476, fn. 8 [78 Cal.Rptr.2d 110].) Although this reality may be an unfortunate by-product of the court's order, it does not provide a legitimate basis for attacking it. As we have explained, the court may deny visitation to an incarcerated parent who has been denied reunification services, even in the absence of any showing that continued visitation would be detrimental to the child. Because mother failed to show the court erred in denying her visitation under the circumstances of this case, her attack fails.

## B. *Compliance with ICWA*

Mother contends the juvenile court and the Department erred by failing to fulfill their duty of inquiry for ICWA purposes.

The form petition (JV-100 (eff. Jan. 1, 1991)) provided two checkboxes concerning the ICWA. Box 1(*l*), if checked, meant, "Child may be a member of, or eligible for, membership in a federally recognized Indian tribe." Box 1(m), if checked, meant, "Child may be of Indian ancestry." Neither was checked. Father did complete a form JV-130, entitled "Parental Notification of Indian Status," which was filed with the court. On that form, father checked box 3(d), which stated, "I have no Indian ancestry as far as I know." There is no form JV-130 in the record for mother.

The minutes of the detention hearing state the court "inquired of the father" concerning J.'s Indian heritage, but no such inquiry is contained in the reporter's transcript of the hearing. The detention hearing minute order includes the following: "The court has no reason to know that the child may

be an Indian child as defined by the Indian Child Welfare Act. Therefore, the Indian Child Welfare Act does not apply." This finding, however, is not included in the reporter's transcript of the hearing.

The question of Native American heritage was not raised at the jurisdiction/disposition hearing, and mother was not asked about her heritage, although it was her first appearance before the court. The social study prepared for disposition states that mother is of "Caucasian descent" and father "is of Caucasian descent with no known American Indian heritage," but none of the social study reports state that mother was asked whether she had any Indian ancestry.

It is apparent from the record that mother was never asked whether she had any Indian ancestry. Pursuant to California Rules of Court, rule 1439(d), the court and the Department "have an affirmative and continuing duty to inquire whether a child for whom a petition under section 300 . . . has been[] filed is or may be an Indian child." Under rule 1439, subdivision (d)(2), "the social worker must ask . . . the parents . . . whether the child may be an Indian child or may have Indian ancestors." Further, under rule 1439, subdivision (d)(3), "[a]t the first appearance by a parent or guardian in any dependency case, . . . the parent . . . must be ordered to complete form JV-130, *Parental Notification of Indian Status*." (Italics added.) The Department concedes the record does not show these rules were complied with, but urges us to find any error harmless since there is nothing in the record to indicate mother has any Indian ancestry. We refuse to speculate about what mother's response to any inquiry would be, however, and instead remand the matter to the trial court with directions, as set forth below.[6]

## DISPOSITION

The matter is remanded to the juvenile court with directions to inquire of mother whether J. is or may be an Indian child. If the inquiry produces evidence that J. is or may be an Indian child, then the juvenile court should direct the Department to give notice of the underlying proceedings and any

---

[6] The cases the Department relies on for its contention we may find the error harmless are all distinguishable, as none involve the complete failure to inquire of a parent regarding his or her ancestry. (See *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16 [33 Cal.Rptr.3d 242] [defective notices subject to harmless error analysis]; *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 866–867 [11 Cal.Rptr.3d 1] [augmented record showed proper notice sent to tribes]; *In re Aaliyah G.* (2003) 109 Cal.App.4th 939, 942–943 [135 Cal.Rptr.2d 680] [sufficient evidence inquiry made]; *In re Christopher I.* (2003) 106 Cal.App.4th 533, 564–565 [131 Cal.Rptr.2d 122] [failure to give notice harmless where no evidence in record child had Indian heritage]; *In re O.K.* (2003) 106 Cal.App.4th 152 [130 Cal.Rptr.2d 276] [no duty to provide notice where information provided insufficient to give court reason to believe minors might be Indian children].)

upcoming hearing(s) in compliance with ICWA to the Bureau of Indian Affairs (BIA) and any identified tribes. (25 U.S.C. § 1913.) The Department shall document its efforts to provide such notice by filing such documentation and any and all responses received with the trial court. (See *In re H.A.* (2003) 103 Cal.App.4th 1206, 1214–1215 [128 Cal.Rptr.2d 12].)[7] If the BIA or any tribe responds by confirming that J. is or may be eligible for membership within 60 days of sending proper notice under the ICWA to the BIA and any identified tribes (Cal. Rules of Court, rule 1439(f)(6)), the court shall proceed pursuant to the terms of the ICWA and is hereby authorized to vacate, in whole or in part, any prior dispositional finding or order which is inconsistent with ICWA requirements. If the inquiry of mother produces no evidence that J. is or may be an Indian child, or there is no confirmation that J. is or may be eligible for Indian tribal membership, the court may proceed accordingly.

Harris, Acting P. J., and Dawson, J., concurred.

---

[7] The notice form mentioned in our *In re H.A.* opinion (*In re H.A., supra,* 103 Cal.App.4th 1206) has been superseded with new forms promulgated by the California Department of Social Services and the California Judicial Council.