Filed 7/14/14  In re M.N. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.N. et al., Persons Coming Under the Juvenile Court Law. | B251908 c/w B253144 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>ARACELY A.,<br><br>　　　Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK78253) |

　　　APPEAL from orders of the Superior Court of Los Angeles County.  Jacqueline Lewis, Judge.  Affirmed.

　　　Patti L. Dikes, under appointment by the Court of Appeal, for Appellant.

　　　John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Respondent.

_____

This is a consolidated appeal from two orders in dependency proceedings involving two-year-old M.N. and his infant brother, C.N. (the children). In case No. B251908, Aracely A. (mother) appeals from a July 11, 2013 order, which she contends improperly delegated visitation rights to the prospective adoptive mother. In case No. B253144, mother contends the October 10, 2013 order terminating her parental rights should be reversed because the limitations on her visitation rights denied her the ability to demonstrate the beneficial relationship exception to the preference for adoption and termination of parental rights. We affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

When mother gave birth to M.N. in 2011, M.N.'s four half-siblings were already in the custody of the Department of Children and Family Services (DCFS) and placed with maternal aunt Elizabeth V.[1] Like his two youngest half-siblings, M.N. tested positive for amphetamines and methamphetamines at birth. M.N. was detained and eventually placed with his paternal grandparents. Following the detention hearing on September 26, 2011, mother and father were given thrice weekly monitored visits of two hours each. Meanwhile, as sustained on November 8, 2011, a petition alleged that M.N. was a person described by Welfare and Institutions Code section 300, subdivision (b) because mother used illicit drugs while pregnant with M.N. (paragraph b-1) and mother had an unresolved history of illicit drug use which had resulted in the four older siblings

---

[1] The four older children were P.A., E.S., M.S. and E. S. (referred to collectively as the older children). After M.S. tested positive for methamphetamines at her birth in 2008, mother entered into a Voluntary Family Maintenance plan. When E.S. was born a year later with a positive toxicology for amphetamines and methamphetamines the four older children were detained and eventually declared dependent children as a result of mother's illicit drug use, among other things. In September 2011, mother's reunification services were terminated as to the older siblings. Dependency proceedings for the older siblings were still ongoing when M.N. was born.

receiving permanent placement services (paragraph b-2).[2] Father was given reunification services. Because mother had failed to reunify with M.N.'s older siblings, mother was given no reunification services. (See § 361.5, subd. (b)(10) [failure to reunify with siblings], & (13) [history of chronic drug use].) The minute order included a visitation order for father (the same monitored visits he received following the detention hearing), but not for mother. (The record does not include a copy of the Reporter's Transcript from the November 8, 2011 hearing.)

Mother was incarcerated for about a week in early March 2012. By early May 2012, she had missed 10 scheduled drug tests. At the status review hearing on May 8, 2012, the court set a section 366.26 permanent placement plan hearing (.26 hearing) for September 5, 2012. Although the jurisdiction order did not include a visitation order for mother, mother accompanied father to visits which were monitored by paternal grandparents at their home. But after mother threatened Elizabeth V. and the father of one of the older siblings, and the paternal grandparents told the social worker they were too intimidated by the parents to enforce the court-ordered time limitations on the visits, DCFS suspended those visits until a new location and monitor could be arranged.

By the continued .26 hearing on September 5, 2012, no alternate visitation arrangements had been made. The juvenile court ordered DCFS to create a visitation schedule within 72 hours. The minute order for the hearing states: "Monitored visits for MOTHER/[FATHER] to be monitored by DCFS approved monitor in DCFS OFFICES." The .26 hearing was continued to January 4, 2013.

Later that same day (September 5, 2012), mother gave birth to C.N., who was detained after he tested positive for amphetamines. As eventually sustained, the section 300 petition as to C.N. alleged he tested positive for amphetamine at birth

---

[2]  The petition also alleged that M.N.'s father had a history of illicit drug use and currently used illicit drugs (paragraph b-3). M.N.'s father is not a party to this appeal.

All future undesignated statutory references are to the Welfare and Institutions Code.

(paragraph b-1) and mother's history and current use of illicit drugs had resulted in C.N.'s four older siblings receiving permanent placement services (paragraphs b-2 and j-1). Following the detention hearing, mother was given monitored visits with C.N., who had been placed with a foster family. Mother was soon thereafter incarcerated.

On November 8, 2012, Elizabeth V. was appointed the older siblings' legal guardian and dependency jurisdiction was terminated as to them (parental rights were not terminated). M.N.'s .26 hearing and C.N.'s adjudication hearing were continued to December 17, 2012. A week before that hearing, both M.N. and C.N. were placed with maternal aunt, Maria J., who assured DCFS that she could both protect the children from the parents and still facilitate visitation. In addition, Maria J. and Elizabeth V. had a close relationship which would enhance sibling visits.

C.N.'s jurisdiction and M.N.'s .26 hearings were continued to January 4, 2013. On that date, mother was still incarcerated. M.N. and C.N. were doing well in their placement with Maria J. The juvenile court sustained the petition as to C.N., ordered no reunification services and continued the matter to May 2, 2013 for a .26 hearing as to both M.N. and C.N. (See § 361.5, subd. (f) [if reunification services are not ordered pursuant to subdivision (b), court shall determine whether .26 hearing shall be set].) Notwithstanding the denial of reunification services, mother was given monitored visits with C.N. and there was no change to the prior order giving mother monitored visits with M.N.

Mother was still incarcerated by the time of the .26 hearing on May 2, 2013 and she had not visited the children in many months. The children were doing well with Maria J., who wanted to adopt them both. DCFS recommended adoption as the permanent plan. At the hearing, there was the following colloquy about mother's visitation: "[MOTHER'S COUNSEL]: . . . So I would ask that, if [Maria J.] is willing to bring the children to the facility for the [visits], mother is eligible and participating and can receive visits at her place of incarceration. [¶] [THE CHILDREN'S COUNSEL]: And I would just ask that that be contingent on maternal aunt's – on maternal aunt [Maria J.]. [¶] THE COURT: If the aunt wishes to take the children to see the mother

4

[at the place of incarceration], that's fine with the court." Mother neither objected that the court had improperly delegated to Maria J. the power to decide whether any visitation would occur, nor did mother seek appellate review of the May 2, 2013 order on that or any other grounds. The .26 hearing was continued to July 11, 2013. Over the next several months, mother filed two section 388 petitions seeking reunification services. Both petitions were denied.[3]

A.      *The July 11 Order*

According to the report for the continued .26 hearing on July 11, 2013, the children continued to do well with Maria J. and a completed adoptive home study was anticipated. There were no witnesses at the hearing. The juvenile court identified adoption by Maria J. as the permanent placement plan for both boys, appointed Maria J. as the children's educational representative, and continued the matter to October 10, 2013 for a contested .26 hearing. There was another colloquy regarding visitation: "[MOTHER'S COUNSEL]: Your Honor, [mother] is requesting visits through the A.B.C. program. I know we've discussed that at a previous date, and the court made an order that if [Maria J.] wanted to bring the children through the A.B.C. program, that she was able to for visits at [mother's] place of incarceration. [¶] [Mother] is informing me that she'll be discontinued from the program if the children are not brought in for any

---

[3]      The first petition, filed on May 29, 2013, sought placement of M.N. and C.N. with mother or, alternatively, that she be given reunification services. Among the changes mother listed in support of the petition were her completion of several programs where she was incarcerated, as well as acceptance into a program that would allow the children to visit her there. Following a hearing that same day, the juvenile court denied the petition.

Mother filed the second section 388 petition on September 16, 2013. It sought termination of the adoption process so that mother could regain custody of the children. According to the petition, mother expected to be released from jail on November 21, 2013. The petition was summarily denied for the reasons that the petition did not state new evidence or a change of circumstances and, further, mother was incarcerated and unable to have custody of the children.

5

visits, and she's requesting visits at this time. [¶] THE COURT: Did she discuss that with her sister, [Maria J.]? [¶] [MOTHER'S COUNSEL]: [Mother] wrote to her but has not received a response. [¶] THE COURT: I am not – If the aunt is not willing to do it, I'm not ordering it at this point in this case." Mother did not object that the juvenile court had improperly delegated to Maria J. power over mother's visitation. The minute order from the July 11, 2013 hearing does not specifically refer to visitation. Mother filed a timely notice of appeal from the July 11 order.[4]

B.      *The October 10 Order*

The adoptive home study for Maria J. was approved in late July. There were no witnesses at the .26 hearing on October 20, 2013. Mother objected to termination of parental rights, but offered no evidence or argument in support of her position. In particular, mother did not argue the application of any exception to the preference for adoption. Finding no such exception, the juvenile court terminated parental rights as to M.N. and C.N. and designated Maria J. the prospective adoptive parent. Mother filed a timely notice of appeal.

**DISCUSSION**

A.      *The July 11 Order Did Not Improperly Delegate Visitation Decisions to Maria J.*

Mother contends that denial of her request that the July 11 order include a provision requiring Maria J. to bring the children to mother's place of incarceration for visits constitutes an improper delegation to Maria J. of the court's power to decide whether any visitation would occur.[5] We disagree.

---

[4]     The notice was filed as a Notice of Intent to File a Writ, but processed as a Notice of Appeal.

[5]     We find no merit in DCFS's contention that mother forfeited this issue by couching her request for a visitation order in language that seemed to accept that the prospective adoptive mother had discretion to bring or not bring the children to the detention center. If, as mother argues, visitation was mandatory under sections 362.1,

During the reunification period, visitation is mandatory absent exceptional circumstances and the court may not delegate its power to decide whether any visitation shall occur. (§ 362.1, subd. (a)(1)(A); *In re S.H.* (2003) 111 Cal.App.4th 310, 317.) Even an incarcerated parent may not be denied visitation during the reunification period except upon proof of clear and convincing evidence that it would be detrimental to the child. (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 773.) After reunification services have been terminated, visitation is still mandatory absent a finding of detriment. (§ 366.22, subd. (a) ["The court shall continue to permit the parent or legal guardian to visit the child unless it finds that visitation would be detrimental to the child."]; *In re D.B.* (2013) 217 Cal.App.4th 1080, 1094-1095.) Although it may not delegate whether any visitation will occur, the court may delegate "discretion to determine the time, place and manner of visits." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009 [order for "reasonable visitation" while father was incarcerated was not an improper delegation of the power to grant or deny visitation].) "A visitation order which fails to protect a parent's right to visit is illusory. If . . . the court grants visitation, 'it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact occur.' [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505 (*Hunter S.*).)

By contrast, where no reunification services have been ordered at all, visitation is discretionary, not mandatory. Where reunification services are denied, visitation is governed by subdivision (f) of section 361.5, which provides: "The court *may* continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child." (Italics added.) In *In re J.N.* (2006) 138 Cal.App.4th 450, 458, the court explained that the permissive language in section 361.5, subdivision (f) reflects the reality that "visitation is not integral to the overall plan when the parent is not participating in reunification services." The child in *J.N.* was 20 months old when the mother was incarcerated for voluntary manslaughter after the child's sibling died while in the care of the mother and her boyfriend. The mother received no reunification services and the

subdivision (a)(1)(A) or section 366.22, subdivision (a), trial counsel's inartful request would not absolve the juvenile court of its duty to order visitation.

child was placed with the father. When the child was 10 years old, he was declared a dependent child as a result of the father's failure to protect the child from abuse by the maternal grandparents with whom the child was living. Although mother did not receive any reunification services, she requested telephone visitation. The dispositional order did not include a provision for telephone contact with the mother. The appellate court rejected the mother's challenge to the order, explaining: "[T]he court may deny visitation to an incarcerated parent who has been denied reunification services, even in the absence of any showing that continued visitation would be detrimental to the child." (*Id*. at p. 460.)

We review visitation orders under section 361.5, subdivision (f) for abuse of discretion. (*In re J.N., supra*, 138 Cal.App.4th at p. 459.) Under that standard, we apply a very high degree of deference to the trial court's decision. (*Ibid*.) Further, the parent must demonstrate prejudice. (*In re Chantal S.* (1996) 13 Cal.4th 196, 214.) In *Chantal S.*, dependency jurisdiction was based on the mother's inability to protect the child from the violent father. After the father was incarcerated, the juvenile court terminated dependency jurisdiction with a family law order that required father's visitation to begin only after the father's therapist determined that the father had made "satisfactory progress for a time" and that father's visitation be "facilitated" by the child's therapist. (*Id*. at p. 213.) Our Supreme Court rejected the father's contention that the order constituted an improper delegation of the judicial authority over visitation to the therapists. Even assuming for the sake of argument that the order delegated too much authority to father's therapists, the court found the father was not prejudiced because the fact that the juvenile court could have, but did not deny father visitation altogether "amounts to a windfall to father, not a violation of his rights." (*Id*. at p. 214.)

Here, the July 11 order did not improperly delegate to Maria J. the power to decide whether any visitation would occur. Rather, the juvenile court's statement, "I'm not ordering it," in response to mother's request that the children be brought to the detention center for visits, is a clear exercise of the juvenile court's discretion under section 361.5, subdivision (f) to not order visitation for mother, who had been denied reunification

8

services.[6]  Informing Maria J. that she could bring the children to visit mother at the detention center if she felt it was appropriate did not transform the exercise of discretion to deny visitation into an improper delegation of power over visitation.  The juvenile court did not preclude Maria J. from fostering a continuing relationship between mother and the children; it simply declined to order visitation.

That mother had previously been given visitation even though she was denied reunification services does not compel a contrary result.  The section 361.5, subdivision (f) discretion to not order visitation is triggered by the denial of reunification services for any of the reasons set forth in subdivision (b) of that section.  There is nothing in the statute or case law to suggest that where, as here, the juvenile court exercises its discretion under section 361.5, subdivision (f) to order visitation for a parent who has been denied reunification services, the court does not retain the discretion to change that order.  That is what happened in this case at the hearing on July 11, 2013.  Although mother had been given monitored visitation after she was denied reunification under section 361.5, subdivision (b), by the time of the hearing on July 11, mother was incarcerated, had not seen the children for many months, and adoption by Maria J. was the recommended placement plan.  At this stage of the proceedings, the juvenile court acted well within its statutory discretion to deny continued visitation for mother.

Under *Chantal S.*, *supra¸* even assuming for the sake of argument that the July 11 order delegated too much authority to Maria J., mother was not prejudiced since the court could have denied visitation altogether and giving Maria J. discretion to bring the children to the detention center was a windfall for mother.

B.      *The Beneficial Relationship Exception to the Adoption Preference*

Mother contends the October 3 order terminating parental rights should be reversed.  She does not challenge the sufficiency of the evidence to support the order.  Rather, mother argues that her ability to establish the beneficial relationship exception to

---

[6]      Although raised by DCFS in its Respondent's Brief in case No. B251908, mother does not address application of section 361.5, subdivision (f) in her Reply Brief.

the preference for adoption (§ 366.26, subd. (c)(1)(B)(i)) was "unduly prejudiced" by the juvenile court's failure to order visitation on July 11. We find no error.

In order of preference, the juvenile court's four choices at the .26 hearing are: "(1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) . . . 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53, citations omitted.) The Legislature has recognized that adoption is not the appropriate plan in every case. Relevant here is the exception to the preference for adoption when the child has a strong bond with the parent and severing that bond would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies when the court finds termination of parental rights would be detrimental to the child because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); see *In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*Id.* at p. 621.) In *Hunter S., supra*, the court recognized that a parent deprived of visitation will likely not be able to establish the beneficial relationship exception or have any meaningful chance to avoid the termination of parental rights. (*Hunter, supra*, 142 Cal.App.4th at p. 1505.) Even though denying visitation pursuant to section 361.5, subdivision (f) may hinder the parent from establishing a relationship with the child, by statute the court retains jurisdiction to deny visitation. (*J.N., supra*, 138 Cal.App.4th at p. 460.)

Here, as we have already discussed, the July 11 order was a proper denial of visitation under section 361.5, subdivision (f). As such, it did not itself "unfairly

prejudice" mother's ability to build a relationship with the children to satisfy the exception.

## DISPOSITION

The July 11, 2013 order denying continued visitation to mother and the October 3, 2013 order terminating parental rights and placing the children for adoption are affirmed.


                                        RUBIN, ACTING P. J.

WE CONCUR:



      FLIER, J.



      GRIMES, J.