Filed 7/17/15  In re A.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.V., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E062794 |
| Plaintiff and Respondent, | (Super.Ct.No. J252083) |
| v. | OPINION |
| J. V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

# I

## INTRODUCTION

J.V. (father) is the sole appellant. He is the presumed father to A.V. (the child), a two-year-old boy, the sole subject of this appeal. Father has three other children, B.V., J.V., and K.V., who have a different mother than the child. Father and the child's mother are referred to as the parents.

On appeal, father contends that the juvenile court erred in denying visits with the child after the court terminated his family reunification (FR) services without finding detriment. For the reasons set forth below, we shall affirm the judgment.

# II

## STATEMENT OF THE CASE AND FACTS

On or around November 13, 2013, the child, who was about four months old, came to the attention of respondent San Bernardino County Children and Family Services (CFS) based upon a referral that mother fought with B.V. The parents reportedly engaged in domestic violence, broke mirrors and telephones, and drank excessively. The child's older half siblings, B.V., J.V. and K.V., reported feeling unsafe in the home. They also said that the parents hit them and screamed at them. J.V. had a bruise on his cheek; neither parent could explain how J.V. got this bruise. Since father was on probation for assault, law enforcement arrested him for a probation violation relating to

J.V.'s injury and his failure to protect his children from mother.[1]  Law enforcement often responded to the home to deal with domestic violence and child maltreatment.

On November 15, 2013, CFS filed a petition under Welfare and Institutions Code section 300[2] in the juvenile court addressing risks to the child, whom CFS detained in foster care.  A separate dependency was initiated for the child's half siblings, B.V., J.V. and K.V.

On November 18, 2013, at a detention hearing for the child, the court found a prima facie case under section 300 and detained the child in foster care, but authorized placement with a relative upon completion of home assessment.  The court ordered a minimum of weekly two-hour visits with the parents, supervised by CFS or a delegate.

The jurisdiction and disposition report dated December 9, 2013, stated that mother witnessed father physically abusing J.V., causing a bruise on J.V.'s cheek.  Mother made no effort to protect J.V.  Moreover, although mother denied domestic violence with father, she admitted that there was tension in the home since father's other three children moved in with them in April 2013.  CFS interviewed father at jail.  He agreed with mother's statements regarding domestic violence and the older children causing discord.

Mother had no criminal history.  Father, however, was convicted of receiving stolen property in 1996, felony corporal injury to a spouse in 2010, assault with a deadly

---

[1]  Father may have been on parole, not probation.  His parole officer's information was indicated in a subsequent report.

[2]  All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

weapon in 2010, and abusing or endangering a child in 2013. Father was convicted of misdemeanor marijuana possession, and felony vehicle taking charges in 1995 and 1998, respectively. In 2002 and 2007, father was convicted of domestic violence and served three years, and one and one-half years in prison, respectively. The victim in at least the latter incident was a female, but not mother. Father was also on parole for assault with a deadly weapon. His parole was set to expire soon, but would likely be extended because of the new charges against father.

Mother denied abusing alcohol. The older children, however, reported that the parents drink beer "all the time" and often scream at each other when drinking. Father revealed that he had a past history of substance abuse with methamphetamine, but tested negative through the parole office over the last three years. Father, however, admitted that he and mother had alcohol-related problems.

Mother confirmed that on November 13, 2013, she fought with B.V.; she wore makeup against the parents' direction. Mother tried to inspect B.V.'s makeup, but B.V. swatted mother away. Mother tried to push B.V. away, but B.V. hit mother. Mother yelled at her adult daughter to take the child away to protect him, and called 911 to report B.V.'s behavior. When questioned, father felt mother protected the child and the child was safe with mother. Father stated that mother is a "great mother" and is very "honest and loving."

B.V. told deputies that father recently assaulted J.V. for getting bad grades. Father took J.V. into the bathroom. B.V. heard father yelling and heard smacking sounds. J.V.

4

emerged with a bloody nose and a large bruise on his cheek. B.V. stated that father regularly gets drunk; when intoxicated, he gets "crazy." J.V. confirmed B.V.'s account.

On December 3, 2013, father was convicted of willful child cruelty, and was ordered to attend a child abuse class.

The social worker had "grave concerns" for the safety of the child given father's convictions for violent crimes and apparent anger management issues. Father already completed a 50-week domestic violence treatment program, yet he still engaged in domestic violence with mother and his older children. He also completed a parenting course, but continued to use physical discipline. CFS placed the child with a maternal aunt. The aunt was fearful that father would be upset that she had the child in her care and would try to visit the child at the aunt's home.

Mother had no CFS history. Father, however, had numerous referrals from 2008 to 2012 as a result of alleged neglect, physical abuse, and caretaker absence/incapacity. Father participated in a prior dependency for the child's half siblings. Those siblings were placed with an aunt in 2003 where they remained until September 2012, when the juvenile court ordered family reunification services for father. Father reunified with the children in May 2013, and the case was closed. CFS initiated another dependency on behalf of the half siblings.[3]

---

[3] Dependency proceedings in San Bernardino County are classified by the mother. Therefore, the child's appellate file does not contain most of his half siblings' documents since they have different mothers.

5

By January 10, 2014, mother established a separate residence from father. She also looked for employment and applied for Cash-Aid. Additionally, both parents made efforts to engage in their case plans, and were appropriate and loving at supervised visits with the child.

On January 10, 2014, at the jurisdictional and dispositional hearing, both parents submitted on the CFS reports and recommendations. The court sustained the section 300 allegations relating to the parents' domestic violence, father's excessive abuse of alcohol, and father's physical abuse of a sibling, which placed the child at risk. The court dismissed mother's substance abuse allegations. The court ordered the child removed from father, placed the child with mother, deemed father presumed, and ordered FR services for father and final map services for mother. Father's visits would occur at least twice weekly, supervised by CFS, or a CFS delegate, not including mother.

Father's case plan included general counseling, a domestic violence and parenting education program, and a substance abuse treatment and testing program. Mother's plan included a parenting education program and general counseling, with an anger-management component.

In February 2014, the parents went out for dinner. Mother reported that father did not enter her home, due to visitation restrictions with the child. After dinner, father went into a jealous rage in the car. He accused mother of being loose, struck her on the chin, and threatened to kill her. Mother sustained large bruises on her chin and red marks on her chest. She concluded that father may be using drugs. She did not contact law enforcement at that time, but spoke with her counselor within two days, filed a police

report, and obtained a restraining order in family court against father effective for three years. In April 2014, the juvenile court ordered domestic violence programs for the parents.

The first status review report stated that mother did a good job completing her case plan. Mother stated that the February domestic violence incident was the first time father was physical with her; she ended her relationship with father. CFS remained concerned that mother's counselor only saw bruises on mother by chance and invited mother to talk. Mother then disclosed the domestic violence incident. The social worker doubted that this was the parents' first incidence of domestic violence. The social worker also noted that mother did not seem to fully comprehend the impact domestic violence can have on the child.

Father made moderate progress in his case plan. He attended services and was in contact with the social worker. After the February incident, however, father slowly stopped engaging in services and became hostile with the social worker. With regard to the incident, father explained that he accidently struck mother; she was attacking him.

Mother was still participating in a domestic violence program. Father attended counseling and part of his parenting course, but he failed to attend the domestic violence and substance abuse programs. He tested negative between March and June 2014, but also was a no show for six random drug/alcohol screens in that time frame.

The child was two years old. He was thriving and happy in mother's care. At supervised visits, father was appropriate with the child, who displayed a strong attachment to father. Father missed six visits with the child.

On July 10, 2014, at the review hearing, the court ordered continued final map services for mother, and FR services for father, who would receive at least weekly visits, two hours each, supervised by CFS or a delegate.

Around August 2014, father reportedly broke into mother's home at night and sexually assaulted her for two hours while the child slept. Father was located and jailed for burglary and rape. In a packet dated September 22, 2014, CFS detailed the incident and asked the court to suspend father's visits.

After continuances, the trial addressing CFS's packet was set for January 12, 2015, the same date of the next review hearing.

The status review report dated January 12, 2015, recommended termination of father's services and a dismissal of the petition, with a family law order granting mother full custody of the child and no visits for father.

The report provided that mother did an excellent job completing her case plan. She initially presented as submissive and voiceless, but made tremendous progress.

Mother endured financial hardship because father stopped supporting the child and mother. She secured a job allowing her to provide for the child. She loves the child and does not want to jeopardize his placement with her again. Mother demonstrated protective capacity for the child. She was grateful for CFS intervention, which revealed father's true character, and her own strength she never knew she had.

The prognosis for father's reunification with the child was poor. He made minimal efforts in services, shirked responsibility for his actions, and demonstrated his violent and aggressive nature. The social worker wrote:

8

"It also concerns the undersigned that the father would continue to behave in such a destructive manner despite the department's close involvement and supervision . . . .

". . . [I]t would be in the best interest of . . . [the child] to remain home with his mother where he is happy and can continue to thrive. . . . . [T]here is [*sic*] no further safety or protection issues that require Children and Family Services supervision with the family. . . ."

On January 12, 2015, the court held a trial regarding father's visitation and the final review hearing on this case. The attorneys chose not to elicit testimony, and instead argued their positions concerning father's visits. Father was still in jail at the time.

At trial, CFS recommended a family law exit order permitting monthly visits for father, supervised by a professional monitor. However, the child's attorney noted father faced at least one violent strike and stated:

"I just don't know how they are going to set that up with a professional monitor without father having some sort of contact with mom, being able to follow mom home from the visit. This isn't going to be in any kind of contact order at all with mom.

"And the child was present when this happened and does not need to be subjected to any of that any longer considering there was domestic violence long before this started.

"So we are going to ask for no visitations for father."

Mother's attorney joined in those arguments, and contended that father lacked boundaries. The incident occurred despite a no-contact order between the parties. Mother's counsel argued:

9

"If father can show sometime in the future that he has remediated himself. . . he can go back to the family law court and show that he has. But for now, I just don't see that any changes have taken place in him that would make either [the child] or his mother safe."

Father's attorney objected to suspension or reduction of father's visits, but did not oppose the requirement of monitoring by a professional. Counsel added that the court could specify that father was to arrange visits through the monitor, not mother. Father had not been found guilty; the order would protect mother. Father would not be a danger to the child with supervised visits. Specifically, father's counsel requested visitation to occur twice monthly, supervised by a professional monitor, at father's expense, arranged through the monitor. Counsel also stated that the court could place a "no-contact order restraining order as it relates to the mother . . . ."

Mother's attorney argued that there already *was* a no-contact order in place, which father "violated in a dramatic and violent fashion."

Counsel for CFS asked the court to reduce visits to once monthly, given that the case came to the court in 2013, in large part due to domestic violence between the parents. Counsel summarized the domestic violence incident in February and the alleged rape for which father was in custody. Counsel went on to state:

"I do understand why mother and minor's counsel are requesting a no visits order . . . we are attempting to make it as safe as possible having the professional monitor, but again there are concerns because father has already demonstrated his willingness to violate court orders . . . any visits do pose some risk to the minor."

10

The court then inquired about details on how the visitation exchange could occur safely. The attorneys argued consistent with their positions.

The court then agreed with counsel for mother and the child, given father's history of violence against mother. Counsel for CFS agreed with the court. The court elaborated:

"[Father] has perpetrated against [mother] one of them being in violation of a criminal court order.

"[T]his Court is going to order no visits between [father and the child. Father] will have to rehabilitate himself somehow and make a case in front of a family law judge and show there has been a substantial change in circumstances in order to grant visitation.

"But I am not going to put [mother] in a position where [father] will once again violate a court order and follow her delegate home to find out where she is living at a confidential address. I am just not comfortable making that order."

Father's counsel again objected "to the basis for the finding." Counsel for CFS, however, agreed with the court, stating, "Your Honor, that's fine." The court noted that the "no-visitation order" was over the sole objection by father, and indicated that the social worker's review report was read and considered before terminating father's FR services and dismissing the case with a family law order granting mother full custody and no visits for father.

On January 28, 2015, father filed a notice of appeal relating to the January 12, 2015, hearing.

11

ANALYSIS

Father's sole contention on appeal is that "the court erred when it ordered no visits between father and [the child] when there has been no finding visitation was detrimental to the child, and the child and father share a bond."

CFS claims that the juvenile court "was not required to find 'detriment' before suspending father's visits . . . ." In support of its argument, CFS relies on *In re J.N.* (2006) 138 Cal.App.4th 450. *In re J.N.*, however, is not applicable because the juvenile court bypassed FR services in that case. (*Id*. at pp. 458-459.) In this case, father was given FR services, which were later terminated. To terminate visitation after reunification services have been terminated, the court must find, by a preponderance of the evidence, that continued visitation would be detrimental to the child. (*In re Manolito L.* (2001) 90 Cal.App.4th 753, 760; § 366.21, subd. (h).) We will review the court's factual finding of detriment for substantial evidence. (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.) "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

During the reunification period, visitation is mandatory absent exceptional circumstances. (§ 362.1, subd. (a)(1)(A); *In re S.H.* (2003) 111 Cal.App.4th 310, 317.) Even an incarcerated parent may not be denied visitation during the reunification period

except upon proof of clear and convincing evidence that it would be detrimental to the child. (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 773; *In re Brittany S.* (1993) 17 Cal.App.4th 1399; *In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1237, disapproved on another ground as stated in *In re Zeth S.* (2003) 31 Cal.4th 396, 413; § 361.5, subd. (e)(1) [generally, visitation must be provided to incarcerated parents].) As previously noted, after reunification services have been terminated, visitation is still mandatory absent a finding of detriment. (§ 366.22, subd. (a) ["The court shall continue to permit the parent or legal guardian to visit the child unless it finds that visitation would be detrimental to the child."]; *In re D.B.* (2013) 217 Cal.App.4th 1080, 1094-1095.)

By contrast, as discussed above, where no reunification services have been ordered at all, visitation is discretionary, not mandatory. Where reunification services are denied, visitation is governed by subdivision (f) of section 361.5, which provides: "The court *may* continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child." (Italics added.) In *In re J.N.*, *supra*, 138 Cal.App.4th at p. 458, the court explained that the permissive language in section 361.5, subdivision (f), reflects the reality that "visitation is not integral to the overall plan when the parent is not participating in the reunification efforts." (*In re J.N.*, *supra*, at pp. 458-459.) The child in *In re J.N.* was 20 months old when the mother was incarcerated for voluntary manslaughter after the child's sibling died while in the care of the mother and her boyfriend. The mother received no reunification services and the child was placed with the father. When the child was 10 years old, he was declared a dependent child as a result of the father's failure to protect the child from abuse by the maternal grandparents

13

with whom the child was living. Although mother did not receive any reunification services, she requested telephone visitation. The dispositional order did not include a provision for telephone contact with the mother. The appellate court rejected the mother's challenge to the order, explaining: "[T]he court may deny visitation to an incarcerated parent who has been denied reunification services, even in the absence of any showing that continued visitation would be detrimental to the child." (*Id*. at p. 460.)

Therefore, when reunification services are being provided, it is error to deny visitation with the parent to whom the services apply unless there is sufficient evidence that visitation would be detrimental to the child. (*In re Jonathan M*., *supra*, 53 Cal.App.4th at p. 1238 [arbitrary geographical limit of 50 miles insufficient]; *In re Dylan T*., *supra*, 65 Cal.App.4th at pp. 773-774 [denial of visitation improperly based upon minor's age alone]; *In re Brittany S*., *supra*, 17 Cal.App.4th at pp. 1406-1407 [denial of visitation improper where mother incarcerated only 40 miles distance].) A finding of detriment will be implied when there is substantial evidence in the record to support it. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924-925, superseded by statute on another ground as stated in *In re Cody W*. (1994) 31 Cal.App.4th 221, 230; see also *In re Corienna G*. (1989) 213 Cal.App.3d 73, 83.) An appellate court's review of a juvenile court's finding of detriment is limited to considering whether substantial evidence supports the finding. (*Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625, superseded by statute on another ground as stated in *In re Adrianna P*. (2008) 166 Cal.App.4th 44, 54.)

Here, substantial evidence supports the juvenile court's implied finding of detriment to continue visitation between father and the child.

14

In this case, the evidence showed:

(1)  Before CFS intervention, deputies often responded to the home of father and mother to address domestic violence and child maltreatment.

(2)  Father has a lengthy CFS history.  He participated in dependency for the child's siblings.  Father resisted reform; he came to the attention of CFS shortly after dismissal of the case and the siblings came to live with him.

(3)  Father had a violent criminal history, including felony corporal injury to a spouse, assault with a deadly weapon, and abusing or endangering a child.  He was imprisoned for domestic violence in 2002 and 2007.

(4)  Father abused alcohol and methamphetamine.  He reportedly often got drunk; when intoxicated, father was "crazy."

(5)  Father physically abused J.V., causing injuries to his face because of bad grades in school.  This abuse led to father's conviction for willful child cruelty.

(6)  When this case commenced, father was on parole for assault, which was likely to be extended due to father's abuse of J.V.

(7)  At the onset of this case, the social worker had grave concerns for the child's safety because of father's violent criminal history and anger management issues.  Father completed services but was still violent.  The maternal aunt, who briefly cared for the child, openly feared father.

(8)  During the pendency of this dependency, in February 2014, father went into a violent jealous rage, struck mother and threatened to kill her.  He left visible injuries on

15

her face and chest.  Mother thought that father may be using drugs.  She contacted police and obtained a restraining order.

(9)  After the February 2014 incident, father stopped engaging in services and missed visits with the child.  Father became more hostile with the social worker.  He was a "no show" for random drug and alcohol screens.

(10)  Around August 2014, father reportedly violated the restraining order by breaking into mother's home and sexually assaulting her for two hours while the child slept.  Father was incarcerated for burglary and rape.

(11)  In the final report, the social worker stated that father failed to take responsibility for his actions and demonstrated his violent and aggressive nature, even with CFS's close supervision of the case.

On January 12, 2015, the juvenile court terminated FR services and denied visitations with the child.  In making this determination, the court noted that father defied a restraining court order to protect mother, and allegedly raped her for two hours with the child in the same home.  The court, in denying visitation, reiterated that father had failed to rehabilitate himself from the reasons that gave rise to the child's and his siblings' dependency, as summarized *ante*.  The court stated that father would "have to rehabilitate himself somehow and make a case in front of a family law judge and show there has been a substantial change in circumstances in order to grant visitation."

Based on the above, we find that substantial evidence supports the juvenile court's implied finding of detriment.  Therefore, we find no error in the court's no-visit order.

16

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

KING
J.

MILLER
J.

17