Filed 4/28/22  In re A.A. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. M.A., Defendant and Appellant. | G060760 (Super. Ct. Nos. 21DP0388, 21DP0389 & 21DP0390) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Mary Kreber Varipapa, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant M.A.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the minors.

M.A. (Father) appeals the juvenile court's order made at the combined jurisdiction/disposition hearing denying him visitation. Father contends the court erred by denying him visitation because insufficient evidence supported the court's order and the court improperly delegated its decision-making authority.[1] Father's contention lacks merit, and we affirm the orders.

FACTS

On April 9, 2021, Father's three children, 16-year-old A.A., 14-year-old A.R.A., and 12-year-old S.A. were removed from Father due to allegations of general neglect. Mother retained custody.

I. *Circumstances Leading to Dependency Proceedings*

The detention report stated that on March 21, 2021, Father and Mother argued and fought. Father hit Mother on the head three or four times with a steel cup causing dizziness. Mother went to a neighbor's home with the children because she was scared. Two of the children witnessed the incident and were afraid to return home. Father was arrested, and Mother was issued an emergency protective order. Father violated the protective order on April 7 and was arrested.

The report stated Mother alleged Father continued to commit domestic violence. Mother said that during the March 21, 2021, incident, Father grabbed her by the shirt and hit her on the head with a metal cup on the scalp three to four times. Father hit A.A. with a shoe on the face because she did not stop crying. Mother did not call the police sooner because she feared Father would retaliate and feared losing her children. Mother said Father hits A.A. and S.A. with his open hand and closed fist on the face and body. Father also body shames his daughters, A.A. and S.A., for no reason.

---

[1] Because only Father appeals from the court's order denying him visitation, we focus only on the facts and findings relevant to his case.

2

A.A. and S.A. stated Father hits them for no reason. S.A. said Father was always upset and punched her with a closed or open hand and hit her on the head with his wrist. A.A. said Father would "'beat'" her with a closed fist, open hand, or wrists. She confirmed Father hit her with a wood platform shoe on the face for crying after witnessing the domestic violence incident on March 21. A.R.A. said that whenever Mother and Father fight, Father hits A.A. and S.A. He estimated there were five to 25 incidents per month. Father consistently denied hitting Mother or his children.

The Orange County Social Services Agency (SSA) filed petitions alleging A.A., A.R.A., and S.A. were children as described in Welfare and Institutions Code section 300, subdivisions (a) [serious physical harm], (b) [failure to protect], and (j) [abuse of sibling (A.R.A. only)].[2]

On April 20, 2021, Mother denied the petition's allegations. Father denied the petition's allegations and through counsel invoked his Fifth Amendment rights as to any past or present incidents of domestic violence, child endangerment, or violations of any restraining orders. The court concluded it was necessary to detain the children for their protection and remove them from Father's physical custody because there was a substantial danger to their health. Despite SSA's recommendation of monitored visits for Father, the juvenile court ordered no visitation for Father pending the next hearing to have "a cooling off period."

On Mother's request, the court issued a restraining order against Father. Father was prohibited from contacting Mother and the children in any way and was ordered to stay 300 yards away from them.

II. *Jurisdiction/Disposition Report*

In the June 2021 report, SSA reported that in 2016, a three-year criminal protective order issued protecting Mother from Father; it was modified to allow for

---

[2]     All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

3

peaceful contact. In 2002, Father was convicted of driving under the influence, and in 2017, he was convicted of spousal battery.

The social worker reported S.A. said she felt safe at home because Father was not there but she worried "'what is he going to do next.'" S.A. stated Father had a restraining order but continued to attempt to contact the family. She said Father continuously reminded her that she should be thankful Father had given her freedom. S.A. disclosed Father called her and her siblings curse words in the Urdu language— "'Fuckers,'" "'Bitch,'" and "'Dog.'"

The social worker reported A.R.A. stated that when he misbehaves, Mother "'will talk to me'" and Father "'will yell at me.'" A.R.A. said Father "'hits my sisters for no reason and it is not even discipline, it is just out of nowhere, he slaps them on the face.'" His account of what occurred on March 21 was similar to his Mother's and sisters' reports. He said Father "'gets mad about random stuff and starts hitting; usually mom.'" A.R.A. said Father hit him until he confronted Father in January 2021. He said Father "'hit [his] sisters because he knew they were vulnerable.'" He said Father had become increasingly violent and abusive the last month. A.R.A. confirmed Father went to the house in violation of the restraining order.

The social worker reported A.A. stated Father uses "'weed because I smelled it.'" A.A. stated her parents take away her cell phone when she misbehaves. She denied Mother or Father used physical discipline to punish her. Her account of what occurred on March 21 was similar to her Mother's and siblings' reports. She confirmed Father hit her with a shoe, she went to her bedroom to go to sleep, and Mother joined her. Around midnight, Father entered her bedroom and threw "'boxes on us and it hit me in the head.'" She stated Father told them to clean up the boxes, cursed at them, and left. The next morning, she was sitting in the couch when Father sat next to her and said, "'say something or I'll hit you.'" She talked to Father because she was afraid he "'would beat [her].'" A.A. said Father "'beats me and my sister for no reason.'" She had not seen

4

Father hit Mother, but she had heard them arguing. A.A. said she was "'[h]appy that [Father] went to jail. Every time he would hit us, he would say it was our fault.'" She said, "'I am afraid of him, I can't sleep. I have anxiety like what is he going to do next. He keeps trying to call us.'" A.A. stated that the previous week, Father had broken into the home to get jewelry, and she called the police. S.A. spoke to Father, who was crying, about leaving. A.A. was worried because Father threatened the family by stating, "'I'll just kill you guys.'"

The social worker did not contact Father because he had invoked his Fifth Amendment rights. However, the jurisdictional report included information Father provided on a telephone call he initiated with the social worker. On April 21, Father called the social worker and they spoke for about 30 minutes. Father kept speaking over the social worker and it was difficult for her to speak. The social worker reminded Father of his invocation of his Fifth Amendment rights. Father reported he had arthritis and was disabled. He said he came to this country in 1993 and cannot walk much and had gained weight. Father stated, "I will say everything. I know this is planned. We have proof of everything." Father reported he was homeless because of the court case and he had $1,500 hidden in the home that he did not want Mother to find. Father asked the social worker if he could tell her where the money was located and she could obtain the money. The social worker said it would not be appropriate for her to do so. Father asked if he could go home and get the money. The social worker advised Father of the protective orders and the importance of following these orders.

Father stated that despite his pain, he was an "'outgoing'" father who took his children places. Father started crying as he said, "'I'm not a bad person. Look at my culture.'" Father said he knew about "'U.S. culture'" and the "'OJ case'" and "'that is why they treat everybody as a threat regardless of the same way and for small issues too.'" Father said, "'[L]isten to me carefully. The reason she was calling the police is because I called the bank, and the account was closed.'" The social worker reminded

5

Father of his invocation and he began talking about marijuana and reported he only used it once about six months ago.  Father provided his e-mail address, and the call ended.

When the social worker met with Father to discuss services, Father stated he should not be required to complete the recommended services because the allegations were false.  Father claimed his children have been turned against him to make him look evil and it was unfair.  The social worker reminded Father that because he invoked they could not discuss the allegations.  Father said his friends would not believe what was happening and he did not belong in juvenile court.

Later, Father sent the social worker text messages.  One message asked for help finding a marriage counselor.  Another message stated the following:  "Plz advise [Mother] not to misuse credit cards or it will ruin her credit I have helped her fully restore for 18 years to built her credit and made payments for she is not responsible handling it now and it will be very difficult in future to get anything done like car loan, applying for anything in life, job etc. etc.  Good credit is needed everywhere for almost everything now a days.  Plz let her know I have paid min payments as usual on her both chase credit cards one which has about 8k was due 4/27/21, last month paid about $882 from stimulus payment check on promotional balance offer was expiring to avoid high interest is paid advise to review statement other new chase credit card where [A.A.] is authorized user but moving forward she can pay min cards & Bank of America credit card since I don't have extra funds due to my additional rent a room now utilizes and living expenses.  I will still do whatever I can in my ability to help.  Note:  she needs to call chase and Bank of America to remove from auto pay which has my only bank info where min payments were taken out automatically on due date."[3]  Father also asked for a referral to a legal aid lawyer for his family court matter.

---

[3]     We quote the text messages verbatim.

6

Another text message stated: "Hi, [social worker], I received a call yesterday coming and put a alcohol bracelet why is that necessary now? I was taking drug test. I don't drink Trust me. I just feel I am asked things to do which I don't even do my God knows." As of May 19, 2021, Father had submitted seven drug tests and all were negative.

The report included information about a text video clip Mother sent to the social worker on May 17, 2021. The video was taken on Mother's cell phone and showed a time stamp of Tuesday, May 11, 2021, at 6:41 p.m. The video was purportedly taken when Father violated court orders and came to the home. The family was able to get Father to exit the home and remain on the patio for the police. S.A. could be heard telling Father firmly, "'Yes, now sit down.'" A.A. sent the social worker a text message Father had sent her and group chats with her siblings.

The social worker reported Mother stated, "'I don't want [Father] to see my kids. I don't want the children to be terrified or emotionally disturbed. They're good students.'" Father said he wishes to return to the family home and SSA's case is based on lies. S.A. said she does not want to have any contact with Father at this time. A.R.A. said he does not want to see Father at this time. And A.A. said she feels at peace with Father out of the home and said she does not want to have visitation with Father.

The social worker indicated the risk of harm for the children was "high" and provided a detailed safety plan that included Mother's agreement she would comply with the restraining order and contact the police if Father returned home. Mother's progress toward alleviating or mitigating the cause necessitating the court's involvement was described as minimal, and Father's progress as none. SSA recommended the court sustain the petition's allegations, the children be declared dependents, the children remain in Mother's custody under SSA's supervision, and Mother be directed to participate in the case plan's services.

At a June 2021 hearing, the court denied Father's request for visitation. The court continued the jurisdiction hearing.

### III. Addendum Reports

In the first addendum report dated July 28, 2021, the social worker reported that as of June 2021 Father was working his plan. Father told the social worker he participated in the following: parenting classes through Olive Crest (completed); individual counseling—about eight sessions; marriage videos through YouTube; anger management with Dr. Pam Geoffrey; and psychiatrist (appointment July 7, 2021). As of July 2021, Father had submitted an additional seven drug tests. He failed to appear for two tests and once arrived too late to submit a test. He tested negative four times.

Father told the social worker that through his counseling he learned to engage in active listening and that being a "dictator" is not the way to go about things. Father explained he learned about alternatives to discipline by providing children with options and explaining why something was to be done rather than saying it just had to be done with no explanation. Father said parents have to have good communication for cooperation and he would utilize those communication skills with the children. Father told the social worker the big issue was the confinement during the peak of the COVID-19 pandemic. He said arguments occurred because everyone was in one place, and no one could go anywhere. Father said he wanted his family to know he still cared and was there for them.

A.A. told the social worker she misses Father like one would miss any other relative that has not been around for a while. When told in July it had been a while since he had seen Father, A.R.A. said "it hasn't been that long." A.R.A. stated he does not miss Father. The social worker asked S.A. if anything had changed in the relationship between her and Mother since Father left the home. S.A. said Mother had been acting "'really different'" lately and yelling more often. S.A. said Mother "'yells at all of us equally'" when they do something wrong. She said Mother slapped her across

8

the face but it did not happen in a long time. SSA recommended the court sustain the petition, declare the children dependents, provide family maintenance services to Mother, and provide enhancement services to Father.

In the second addendum report also dated July 28, 2021, SSA's recommendation remained the same. The social worker reported Father provided her with a copy of his mental health assessment. The assessment reflected a diagnosis of obsessive compulsive disorder (OCD) (inactive) and unspecified trauma and stressor related disorder. The social worker explained Father received an alcohol monitor and there was no detection of alcohol or tampering during the reporting period.

SSA's recommendation remained the same in the third addendum report dated August 20, 2021. The social worker reported Mother told her that Father harassed her at the last court hearing. Mother said she reported this to the court and the police department. Mother said Father created a fake Instagram account and ordered food from Mother's business. Mother said she became suspicious of the account when the account started sending her messages asking about her family dynamics and stating the sender was a marriage counselor and requesting if Mother needed counseling. Mother said she went through the fake Instagram account's followers and discovered they were Father's relatives. Mother stated Father recently had someone with a female voice call her credit card company and authorize a balance transfer of $20,000 to Father, but she was able to stop the transfer. Mother provided the social worker with cell phone screen shots of Father contacting her through third parties.

The final addendum report dated September 7, 2021, included the same recommendation. The social worker reported she spoke with A.A. concerning possible visitation with Father. With an alarmed tone in her voice, A.A. asked why Father would be offered visitation. The social worker informed A.A. that visits would be on the terms she and her siblings requested if they chose to visit with Father and with the therapists approval. A.A. explained she understood but said S.A. had not exhibited anger since

9

Father left the home. She said she knew Father went to a psychiatrist for depression and OCD. She said Father was prescribed medication, but she did not know if he ever took it. When asked to describe Father's behavior, A.A. said, "'Everything is wrong, and everyone is wrong unless it is how he wants it or how it says he wants it to be.'"

IV. *Jurisdiction/Disposition Hearing*

After counsel argued, the juvenile court ruled it would consider the evidence for the jurisdiction, disposition, and a temporary restraining order. The court admitted the reports into evidence. SSA's first witness was Father.

A. *Father's Testimony*

Father testified he completed a 52-week domestic violence program due to his 2017 domestic violence conviction. Father learned that when there was an argument one person had to walk away and he had done that many times. Father admitted he would yell at his children while disciplining them even though it "is not good." Father also admitted there had been an incident on March 21, but said it was an argument not a fight. He claimed Mother was the aggressor and he pushed her away. Father denied throwing water in Mother's face and said the water came out of his mug when Mother was hitting him. Father also denied grabbing Mother by the hair, slapping her, or hitting her in the head with a metal cup. When told his children allegedly observed these things, Father said Mother coached them and they lied to the social worker.

Father admitted he had a bottle of alcohol in his closet but denied drinking in the children's presence. Father denied the children's accusation he gets angry and yells when he drinks. He disputed the children's statements he would come home two to three nights a week after drinking and keep them up until 4:00 a.m. on school nights. Father denied having a drinking problem explaining his religion forbids it. He admitted he was convicted of driving under the influence in 2002.

Father stated he complies with the restraining order. He admitted speaking to Mother in the hall at the last court hearing but he only said hello. He did not think it

10

was a violation to speak to Mother in the courthouse. Father denied ever hitting the children for no reason. Father continued to dispute and deny all of the allegations alleged in the petition or made by the children.

Father denied refusing to give his social worker permission to speak with his psychiatrist. He initially denied his social worker asked him to sign a release to speak with his psychiatrist but then admitted he had and said he wanted to speak with an attorney first. When asked about what effect the case has had on his children, Father said the children were sad because they did not want to talk to the social worker. Father denied contacting his children in violation of the restraining order and disputed the pictures taken of his alleged text messages.

Father testified he used hydrocodone for his arthritis. Father denied telling Mother in the hallway at the last court hearing, "You're going to regret this. . . . Don't you know our culture doesn't allow this?" Father denied involvement in the attempted bank transfer, but later, without admitting he had attempted a bank transfer, Father said he was legally an authorized user. Father denied trying to contact Mother through her business account. Father denied his neighbors' reports they had seen him driving in the neighborhood. Father later non-responsively mentioned a road was closed near Mother's house and counsel asked how he knew that if he had not been in the neighborhood. Father responded, "That's my home. I live there for 20 years." Father said the neighbors had brainwashed Mother.

Father stated SSA was breaking his family apart and without their interference the family would be back together. When confronted with his children's statements to the social worker that they did not want to have contact with Father, he rambled about what a great father he was and said Mother coached the children. Father denied sending Mother a package through Amazon containing a relationship book. Father denied being diagnosed as OCD. Raising his voice, Father denied he told his children he was going to hit them in the mouth and knock their teeth out. Father testified

11

Mother destroyed his life and lied about everything, "100 percent." Father said Mother plotted against him because she wants his money.

Father explained that three or four years ago he went to Las Vegas with a friend and was given marijuana samples, including a vape pen. He claimed the vape pen had been sitting in his closet since then. Father denied cursing at the children and said they do not speak Urdu so they would not know what he was saying. When asked if he ever verbally argued with Mother to the point Mother was crying, he indicated she is easily upset. Father disputed knowingly receiving the restraining order when he was arrested on April 3 insisting he was given many papers. Father admitted he was arrested on April 7 for violating the restraining order. Father admitted entering the family residence on May 11 because he wanted to see his children. Father denied calling S.A. on June 17. Father testified the children were lying if they said they saw him hit Mother or if they said he hit them. Father also denied hitting A.A. In response to A.A.'s report Father hit her on the head, Father responded he did not remember but may have disciplined her.

On cross examination by his counsel, Father testified the petition's allegations were "absolutely not accurate." Father was concerned with Mother having custody of the children because "[s]he's suicidal." Father said Mother hits the children. He was also concerned when Mother did not perform domestic duties.

Father stated that when he returned from visiting his father in Pakistan, Mother and the children were totally different. S.A. brought food upstairs and there were ants. Father also said the children were not doing their laundry and not changing their linens. "[T]hey are so lazy and not taking their responsibility to do their household chores." Father yelled at the children to do their chores, but they would not listen, and Mother would not support him. Father admitted that prior to his classes he was more authoritative, like a dictator. He said he should have listened more and given the children choices.

12

Father explained that photographs marked as exhibits showed how happy the family was on March 21. Later that day, Father said he told the children to pick up the boxes that remained from the party and he went out. When he returned, all the boxes and trash were still there. According to Father, this was the basis of the arguing and insisted it was Mother who was the abuser. Father maintained Mother attacked him when he had a cup of water in his hand. Father disputed Mother went to the neighbor's house because she was afraid. The initial report of the incident according to Father was inaccurate, "absolutely 100 percent."

Father testified he called Mother on April 3 when he could not log into their bank account. He asked Mother if she had changed the password. Mother advised him the account was closed. Father responded, "'Our account is closed? What kind of wife are you? Our account is closed, and you did not even tell me?'" Father hung up on Mother. When Mother called back, Father again hung up on her. Father believed between the altercation on March 21 and April 3 things were going well in the family. Father testified he believed Mother purposely waited to call the police until April 3 to tell them about the events of March 21. Father insisted inconsistencies between statements reported in the police report and the social worker's report indicated Mother was lying. He said, "Because nature take its course. God is watching."

Father testified the children's statements to social workers were untrue. Father explained that once he was separated from his children, Mother coached them. Father said he had a good relationship with A.R.A., played basketball with him, and spent a lot of time with him. Father said he had to "force" the children to go with him because "they don't want to go[]" but they need to get off their electronic devices. Father stated he had a good relationship with his daughters. Father said he told A.A. she was "getting big," and saying she needed to participate in sports at school. Father thought her weight gain was unhealthy and he believed her doctor felt the same. Father insisted the allegations he hit or punched A.A. were 100 percent false.

13

When asked about his 2017 misdemeanor domestic violence conviction, Father claimed Mother made false statements that were part of the police report and he denied committing domestic violence. Father explained he was just taking a knife away from Mother because he thought she was suicidal, and he slapped her to "bring her to her senses back."

Father testified he was doing everything the social worker asked him to do. He was drug testing and attending classes. He initially denied using drugs or alcohol, but then said he used alcohol prior to 2016 and on one occasion since when he was under stress. Father said he learned from his parenting classes that communication is very important, but he questioned how he could do that with the restraining order in place. He learned from his anger management course he should not overthink things and he needed to take a "time out." He denied ever drinking to a point where it interfered with his parenting ability and claimed his children have never seen him drink alcohol. Father said the children lied if they said he saw them drink alcohol, and Mother coached them. Father claimed Mother was financially motivated to make him look like a criminal. Father said he was willing to change and he has changed. Father explained he was a good father before and he is a better father now.

Father testified he missed his family. He denied ever threatening to kill Mother and explained it must be a mistake because of language differences. Father denied asking the imam to contact Mother. Father denied ever sending an Amazon package to Mother. He denied trying to order food from Mother's Instagram account. Father denied intending to violate the protective order when he attempted to speak with Mother in court. He simply told her that they should be trying to save their relationship. He thought the protective order did not prohibit communication in the courthouse.

Father said SSA should have offered the family better services rather than just "obsess[ing]" over him. He said not having visitation with his children for five months had caused him to miss them very much. Father testified he was concerned for

14

his children in Mother's custody because "Mother needs some help." He believed Mother and the children were depressed. He claimed Mother was not properly caring for the children and she was coaching them.

Throughout the entirety of Father's testimony, he was verbally combative, wanting to ask as opposed to answer questions, and was non-responsive making the process of eliciting information extremely difficult. Numerous times, the court was required to interrupt Father in response to an objection and direct him to wait until questions were asked before he began speaking and to answer the questions directly.

Father disagreed with the social worker's statements that his children did not want to see him. He claimed to be shocked by that information.

B. *Social Workers' Testimony*

Social worker Kendall Johnson testified he had been a social worker for about eight months and before that a probation officer for 12 years. He had been assigned to the case since April 8. His role was to facilitate services and make sure those services were completed. Although Father agreed to take the required classes, Johnson was concerned Father was not cognizant of the seriousness of the matters and was not taking responsibility for what he needed to complete. Father asked why he had to take a batterers treatment program when he had previously completed that program. Johnson felt Father could benefit from repeating the program because he had not learned from it.

Johnson explained he asked Father if he understood what the case had done to his children emotionally, Father said he did not. Father said he had not done anything to his children and did not understand why the case was continuing. Father denied the allegations and blamed SSA and Johnson for "brainwash[ing]" Mother.

Johnson testified he had spoken to each of the children individually and each child expressed concerns with having visitation with Father. S.A. stated Father only wanted to come back because there was money involved and he wanted control of the family. A.R.A. said Father just wanted to come home and he does not really care about

15

his children. A.A. said Father's desire to return home was because he wanted to control everything and he did not care about them. Johnson believed Mother and the children viewed Father as a controlling individual. Based on his training and experience, Johnson said he found Father manipulative, not controlling. Johnson said nothing should be deleted from the petition.

Johnson recalled A.A. described Father as narcissistic. A.A. claimed Father only cared about what was important to him. If things were done, it was not right unless he said it was done. His opinion was the only one that counted. Johnson opined the children were happier in Mother's care. When he first met the family, Johnson described the children as being reserved and there was "kind of, like, a gloomy overflow over the children." As the case progressed, the children brightened up and opened up more. They were more talkative, seemed to be happier, and seemed to be more together as siblings. The children told Johnson they had improved since Father has been removed from the home.

Johnson stated that until this point, SSA had not recommended visitation with Father because visitation would be detrimental to the children. All three children were afraid of Father and have described a history and pattern of domestic violence. As to the present, Johnson testified he thought visitation with Father with the approval of their therapist and the children would be beneficial. The children did not want to visit with Father, but Johnson thought at some point with therapy the children would get over past events and decide they wanted to visit with Father. Johnson said SSA would not force a child to visit if they did not want to. He testified SSA had done everything to facilitate a relationship between Father and the children and had not intended to drive a wedge between them.

Johnson testified he was informed Father had been diagnosed with OCD, and Father told Johnson he took medication for the disorder. But the psychiatrist's office treating Father said he had not taken it in years.

16

Johnson testified Father had been cooperative in doing his services overall. He had completed therapy sessions, anger managements classes, a parenting program, a mental health assessment, and drug testing. When asked if A.A. said Mother was very stressed since Father moved out, Johnson said she had. A.A. said she thought part of Mother's stress was because Mother was doing the chores that she believed the children should be doing. A.A. said she missed Father like she would any family member who had been taken away. When Johnson spoke with S.A. in July, she said Mother had been acting differently, was yelling more often, and had slapped her. She also reported Mother had been hitting her and threatening to hit her.

In August, Johnson spoke with A.A. and A.R.A. and both said they did not want to visit with Father, even with a monitor. A.R.A. said he never really had a relationship with Father and he felt like there was no point in having Father around. A.A. also indicated she did not want contact with Father. She claimed Father was a narcissist and only cared about himself. She believed she and her siblings and Mother had been better without Father. She was actually quite disturbed when she heard Father may be getting visitation.

Johnson noted discrepancies between what Father told him and what Johnson observed. For example, Father said he received a bottle of alcohol, and it was still full; he did not touch it. But the bottle Johnson observed in the parents' bedroom closet was almost empty. The children contradicted Father's denial of drinking in front of them. Johnson did not believe Father was honest about his issues with alcohol. He believed it will be difficult for Father to develop a relationship with his children until he takes responsibility.

Mother testified to essentially the same facts she previously reported to the police and the social workers. Mother said she and the children were afraid of Father returning home. Since Father left the home, the children were happier and more open and there was less fear and anger in the home. Mother said she knew Father consumed

17

alcohol because she saw the bottles and she also smelled marijuana on him. Mother denied coaching the children.

Social Worker Erica Edwards testified she had been assigned to this case since the time of the detention report; she prepared the jurisdiction/disposition report. She testified there was a documented history of domestic violence in the home. She based her opinion on Father's previous conviction for domestic violence, Mother's statements, the children's statements, and calls to the police. She said Mother and the children told similar stories of what happened. Edwards believed Father had an issue with alcohol and drugs based on his prior conviction for driving under the influence.

Edwards testified she has consistently recommended the children should be in Mother's custody. She said the children feel safe with and want to be with Mother. She opined returning the children to Father was inappropriate because there was still substantial risk to the children of physical and emotional harm—Father exposes them to domestic violence, physically abuses them, and emotionally traumatizes them. She added the children do not want to return to Father at this time.

Edwards testified domestic violence in the home was emotionally traumatic and it affected children in every way. The children reported they were not doing well in school—A.A. said she planned to run away had SSA not become involved. She explained all of the children have improved since Father was removed from the home. In her opinion, Father never accepted responsibility for the physical and emotional abuse he has caused Mother or his daughters.

C. *Juvenile Court's Ruling*

After hearing argument, the court began by stating the juvenile court was not designed to punish anyone. The court reasoned that based on all the evidence, including the reports and testimony it believed the family was in crisis. The court explained both parents had significant work to do and it may not be easy. It noted both parents should understand that the work going forward was for the benefit of the children.

18

The court acknowledged Father had previously worked on his issues and was willing to continue to work on them. Based on that, the court believed an Evidence Code section 730 report would provide further information to determine how to fashion the service plan for Father. The court did not order a new domestic violence program or a new child abuse program. The court also relieved Father of the requirement he wear the alcohol monitoring device but ordered drug testing.

The court sustained the petitions as to all three children and declared them dependent children. The court found reasonable efforts had been made to prevent or eliminate the need for removal of the children from Father. The court concluded there was clear and convincing evidence that to vest custody with Father would be detrimental to the children and to vest custody with Mother is required to serve the children's best interest (§ 361, subd. (c)(1)). The court opined it did not have enough information to determine what would help the parents and ordered Evidence Code section 730 evaluations for both of them.

The court indicated it needed to address visitation, but it needed the children's therapists' input. The court indicated the children could not simply "say[] no" to visitation but "we have to give them a little space at this time." The court authorized social services to liberalize visitation but only to monitored visitation at a facility. The court stated the following: "So the initial visitation would be in the form of conjoint therapy, once the therapists for the kids have given their input on that."

The court ordered the temporary restraining order to become permanent and expire in three years. The restraining order provided for monitored visitation between Father and the children "to be determined upon input of therapist through SSA only." Father filed a timely notice of appeal.

DISCUSSION

Father argues insufficient evidence supported the juvenile court's implied finding visitation would be detrimental and the court improperly delegated decision-

19

making authority concerning visitation to the children and their therapists. Before we explain why Father's contentions are meritless, we must address which statutory provision guides our analysis.

Father contends section 362.1, subdivision (a)(1), governs visitation. SSA, on the other hand, asserts that visitation here is governed by section 362. We think SSA is correct.

Section 362.1, subdivision (a), by its plain terms applies only when reunification services are ordered. In such cases, visitation must be consistent with the child's well-being and not jeopardize the child's safety. (§ 362.1, subd. (a)(1)(A), (B).) But the juvenile court here did not order reunification services. The court ordered maintenance services for Mother and enhancement services for Father. *In re Pedro Z.* (2010) 190 Cal.App.4th 12 (*Pedro Z.*), is instructive.

In *Pedro Z.*, the court stated the following: "[W]hen a child is adjudged a dependent but is placed in the custody of a parent subject to the supervision of a social worker, the applicable statutory provision is section 362, subdivision (b), which provides that '[w]hen a child is adjudged a dependent child of the court, on the ground that the child is a person by [s]ection 300 and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court.' (§ 362, subd. (b).)" (*Pedro Z., supra,* 190 Cal.App.4th at pp. 19-20.) The court explained those services are not reunification services but instead family maintenance services that are provided "'in order to maintain the child in his or her own home" under the supervision of the county welfare department. (*Id.* at p. 20.) "[W]hen the child remains in a parent's home, the court reviews the status of the case every six months under section 364; under such review, the court is not concerned with reunification, but in determining 'whether the dependency should be terminated or whether further supervision is necessary.' [Citations.]" (*Ibid.*)

20

Where a dependent child remains in the custody of a parent subject to SSA supervision, the court has broad discretion to determine how best to serve and protect the child's interests, and to fashion appropriate disposition orders for the care, supervision, custody, conduct, maintenance, and support of the child. (*In re Kayla W.* (2017) 16 Cal.App.5th 409, 418 (*Kayla W.*); § 362.) Such orders include the discretion to deny visitation for a noncustodial parent. (*Kayla W., supra,* 16 Cal.App.5th at p. 418.)

The juvenile court may deny parental visitation if it concludes visitation is not in the child's best interest. (See *In re J.N.* (2006) 138 Cal.App.4th 450, 458-459; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 454 [at disposition, "'[t]he court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion'"].) In family maintenance proceedings, the juvenile dependency statutes do not expressly require any detriment finding for a court to deny parental visitation. (§§ 362, 362.4, 364.) We will not reverse the juvenile court's determination absent a showing of a clear abuse of discretion. (*In re I.R.* (2021) 61 Cal.App.5th 510, 522 [juvenile court broad discretion in § 362 dispositional orders].)

Here, the trial court did not abuse its discretion by denying Father visitation at the disposition stage of proceedings. The record includes clear and convincing evidence visitation would be detrimental to and not in the children's best interests because the children suffered physical and emotional abuse at Father's hands. That abuse included such things as slaps, hits, punches, and throwing items at the children. Additionally, the record reflects Father inflicted serious emotional abuse. He subjected the children to domestic violence, yelled at the children, and shamed his daughter for getting "big." Father repeatedly accused the children of lying both in comments to the social worker and in his testimony. By his own admission, Father's parenting style was that of a dictator. Additionally, despite Father's denial, the children all expressed concerns about Father's consumption of alcohol.

21

The court reasonably concluded there was overwhelming evidence of risk of harm to the children if Father was granted visitation at this juncture. The children have experienced prolonged emotional and physical abuse from Father. A.A. and S.A. both expressed continued fear of their Father and A.R.A. said it was only after a threatening confrontation with Father that Father ceased physically abusing him. None of the children wanted to have visitation with Father. The court noted the children's reluctance to visit with Father, but clearly stated the decision would not be made just because the children said no. Courts may consider a child's aversion to visiting an abusive parent provided it is not the only consideration in making the visitation determination. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 51.)

Father asserts the court improperly delegated the decision whether he would have visitation to the children and their therapists. We agree a complete delegation to a therapist would have been error. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317-320 [delegation to child improper]; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476-1478 [delegation to therapist improper].) But that is not what the court ordered. The court denied visitation for Father, but authorized social services to liberalize visitation to allow for monitored visitation at a facility after receiving input from the children's therapists.

*In re Chantal S.* (1996) 13 Cal.4th 196, is instructive. In that case, the court ordered father's visitation would not occur until his therapist determined he had made satisfactory progress. (*Id.* at pp. 202, 213.) The Supreme Court approved the order reasoning the order did not vest the therapist with absolute discretion to determine whether visitation should occur. (*Id.* at p. 213.) As was true in *Chantal S.*, the court here did not vest absolute authority with the children's therapists. The court sought their input. And contrary to Father's claim, the court did not vest sole authority with the children—the court opined they needed "space" but said they could not simply "say[] no" to visitation.

22

In fashioning future steps, the court went to great pains to establish a path for Father to establish positive relationships with his children. It commented on Father's past work and cited his willingness to comply with terms. The court clearly was disturbed by the fact Father did not seem to be gaining insight or progressing in alleviating the problems that brought the children into the dependency system, despite his compliance and sincere desire to reunite with his children. The court was hoping that information from the Evidence Code section 730 evaluations of both parents would give it a better understanding of how to fashion a case plan for the future. The record reflects a conscientious judge who was taking every reasonable step to protect the children while at the same time allowing Father to obtain the visitation he so desperately wanted. The court's denial of visitation pending further information was not an abuse of discretion.

## DISPOSITION

The orders are affirmed.




O'LEARY, P. J.

WE CONCUR:


MOORE, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.