Filed 6/13/24  In re P.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. P.R., Defendant and Appellant. | E082577 (Super. Ct. No. J286868) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Annemarie Pace, Judge.  Affirmed.

Sebastien Akarmann, under appointment by the Court of Appeal, for Defendant and Appellant P.R.

Tom Bunton, County Counsel, Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

I.

INTRODUCTION

P.R. (Mother) appeals from the juvenile court's order terminating parental rights as to her four-year-old daughter P.M. (Welf. & Inst. Code,[1] § 366.26). Mother contends that the juvenile court and the San Bernardino County Children and Family Services (CFS) failed to comply with the duty of inquiry under the Indian Child Welfare Act of 1978 (ICWA)[2] (25 U.S.C. § 1901 et seq.) and related state law, and therefore substantial evidence did not support the court's finding ICWA did not apply.[3] For the reasons explained, we affirm the order terminating parental rights.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *General Background*

This case involves Mother's sixth child. Mother has a prior history with child protective services involving five of her other children due to issues with substance abuse and domestic violence in the home. Prior to this case, three of Mother's children were

---

[1] All future statutory references are to the Welfare and Institutions Code.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[3] F.M. (Father) is not a party to this appeal.

adopted: one child in 2017, another in 2018, and another in February 2019. Two of Mother's other children were provided with Kin-Gap services in December 2019.

Ten months after the dependency cases in December 2019 were closed, Mother again came to the attention of CFS in October 2020, after an immediate response referral was received with allegations of domestic violence between Mother and Father and Father and paternal uncle A.R. On October 2, 2020, CFS and law enforcement made contact with Mother, the maternal great-grandmother and then nine-month-old P.M. at Mother's residence while they were seated in a vehicle. After some coaxing, Mother eventually exited the vehicle and came into her residence for an interview. During the interview, Mother stepped away and then left the home with the maternal great-grandmother and the child in the vehicle.

The social worker and a deputy sheriff located the maternal great-grandmother at her home. The maternal great-grandmother informed them that Mother had exited the vehicle with the child at an intersection and that she did not know their whereabouts. While at the home, the social worker spoke to a maternal great-uncle who confirmed that Mother lived an unstable lifestyle. He did not believe the child was safe in Mother's care due to her dangerous, criminal, and substance abuse lifestyle.

On October 2, 2020, a detention warrant was obtained but Mother and the child could not be located. Father was also unable to be located.

On October 6, 2020, a petition was filed on behalf of the child pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of

3

sibling). A first amended petition was later filed to add allegations against Father. At the detention hearing on this same date, the juvenile court formally detained the child from parental custody and granted CFS a protective custody warrant for the child. Neither Mother nor Father were present in court.

Mother and the child were eventually located at a motel in Redlands. Due to outstanding criminal warrants, Mother was arrested and the child was taken into protective custody. Father's whereabouts remained unknown.

The juvenile court took jurisdiction of the instant matter on March 24, 2021. The court found true the allegations in the first amended petition, declared the child a dependent of the court, and provided the parents with reunification services. The child was placed in the relative home of maternal cousin C.C.

Father's services were terminated at the six-month review hearing in September 2021. Although Mother's prognosis was guarded due to her missed drug tests, her services were continued for an additional six months. However, by the 12-month review hearing in March 2022, Mother continued to be noncompliant with her drug testing and had not participated in any outpatient or inpatient drug treatment programs. The juvenile court thus terminated Mother's services and set a section 366.26 hearing to establish a permanent plan for the child.

The child initially remained in the home of maternal cousin C.C. However, by the 12-month review hearing, after a bruise was found on the child's forehead and following an investigation by CFS, the child was moved to another foster home. At the March 2022

4

12-month review hearing, the juvenile court authorized an Interstate Compact on the Placement of Children (ICPC) with Texas for placement of the child with an adult maternal cousin, T.A.-B. and her husband, who were willing to adopt the child. The child was placed with T.A.-B. in Texas on September 14, 2022.

CFS recommended the juvenile court terminate parental rights. The child remained in the home of T.A-B. and her husband M.B. She was healthy and developmentally on track. She had adapted well to the home and was bonded to her caregivers and other family members.

The section 366.26 hearing was held on November 2, 2023. The juvenile court found the child to be adoptable and terminated parental rights. Mother timely appealed.

B. *ICWA Background*

ICWA was found not to apply in Mother's prior cases. In this case, Mother denied having any Indian ancestry orally when inquired by the juvenile court and in her ICWA-020 Parental Notification of Indian Status form (ICWA-020). Father also denied Indian ancestry when inquired by the court and in his "Family Find and ICWA Inquiry" form and ICWA-020 form. Father's family find and ICWA inquiry form listed maternal cousin T.Q. (also referred to as T.C.), paternal uncle J.R., paternal great aunt B.C., and paternal cousin S.P. as possible placements and contactable family members.

CFS identified, contacted or attempted to contact numerous maternal and paternal relatives regarding ICWA throughout the pendency of the case. Specifically, maternal great uncle R.R. denied Indian ancestry in the ICWA-010 form attached to the original

5

petition. Maternal relative R.R. (adult daughter of maternal cousin C.C.) also denied Indian ancestry. Maternal relatives Ms. A. and T.A-B. denied any Indian ancestry. T.A-B.'s husband M.B. also denied any Indian ancestry. The child's adult sibling M.L. denied Indian ancestry as well. In addition, I.M., who was unrelated to the child, but had a child with paternal uncle A.R., denied Indian ancestry and noted paternal uncle A.R. was incarcerated at "WVDC."

Maternal grandfather's whereabouts were unknown. He was somewhere in San Bernardino and no contact information was provided. Paternal grandmother C.C.'s whereabouts were also unknown. It was reported that the paternal grandmother was homeless and that she was in San Bernardino. The phone numbers for paternal uncle J.R., paternal great aunt B., and paternal cousin S.P. were no longer in service. CFS did not have contact information for maternal cousin T.C., maternal cousin Bianca, or paternal uncle A.R. CFS attempted to contact Father to get updated information, but he did not respond. Mother had moved to Arkansas, did not provide accurate updated contact information, and was intermittently responsive to any efforts to set up an interview which was ultimately unsuccessful. Maternal grandmother, maternal great grandmother, maternal great grandfather, maternal great-great grandfather, and maternal great-great grandmother were all deceased.

In August 2023, CFS contacted maternal great uncle R.G.R. and obtained the contact information for maternal great uncle L.R. CFS contacted maternal uncle L.R., who claimed that, according to the maternal great-great grandmother, the family had

6

Indian ancestry through an unidentified tribe. L.R., however, stated that he was "unsure" about this information and that he was never provided with the name of the tribe. CFS sent inquiry letters to the national office and Pacific regional office of the Bureau of Indian Affairs (BIA) with information about the family in September and October 2023, but by the section 366.26 hearing neither had responded. On November 2, 2023, at the section 366.26 hearing, the juvenile court found that CFS had conducted a sufficient ICWA inquiry and concluded ICWA did not apply to the proceedings.

III.

DISCUSSION

Mother challenges the order terminating parental rights on the grounds that the juvenile court and CFS failed to comply with the inquiry requirements of ICWA and related California law. Relying on section 224.2, subdivision (b) and California Rules of Court, rule 5.481, Mother specifically asserts that CFS never inquired with the maternal cousin/former caregiver C.C., maternal cousin T.C., and paternal uncle A.R., who was incarcerated at West Valley Detention Center, as to their Indian ancestry. She further asserts that maternal great uncle L.R.'s claim that, according to maternal great-great grandmother, the family had Indian ancestry triggered a duty of further inquiry pursuant to section 224.2, subdivision (e). CFS responds that there was no statutory duty to inquire of these individuals and that any error in failing to inquire of extended relatives was harmless and not prejudicial.

7

"We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.) On undisputed facts, the appellate court makes an independent determination whether ICWA's requirements have been satisfied. (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)

ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287; see, e.g., 25 C.F.R. § 23.107 (2023); § 224.2; Cal. Rules of Court, rule 5.481.) California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes. (See §§ 224-224.6; *In re Abbigail A.* (2016) 1 Cal.5th 83, 91 ["persistent noncompliance with ICWA led the Legislature in 2006 to 'incorporate[] ICWA's requirements into California statutory law'"].)

"""Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.] The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.""" [Citations.] 'State law, however, more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child."" (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

8

Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 678.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.*, *supra*, at p. 566.) This case does not concern the duty of further inquiry, which arises only if the court or the department has "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), or the duty to provide formal ICWA notice, which occurs only if the court or the department has reason to know that an Indian child is involved (25 C.F.R. § 23.107(c)(1)-(6); § 224.2, subd. (d)(1)-(6)).

The duty of initial inquiry begins with the initial contact when CFS must ask "the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) Part of the initial inquiry also includes requiring each party to complete California Judicial Council form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).) Once a child is taken into temporary custody, CFS must ask the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Specifically, section 224.2, subdivision (b), provides that, "[i]f a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306," CFS's obligation includes asking the "extended

9

family members" about the child's Indian status. Thus, the duty of initial inquiry requires CFS to ask extended family members, which include uncles, aunts, cousins, and grandparents, about the possible Indian status of a child only if CFS has taken that child into temporary custody pursuant to section 306. (*In re Robert F.* (2023) 90 Cal.App.5th 492, 497 (*Robert F.*), review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-678 (*Ja.O.*), review granted July 26, 2023, S280572; *In re Adrian L.* (2022) 86 Cal.App.5th 342, 357-358 (conc. opn. of Kelley, J.); *In re Andres R.* (2023) 94 Cal.App.5th 828, review granted Nov. 15, 2023, S282054; see *In re Darian R.* (2022) 75 Cal.App.5th 502, 507; 25 U.S.C. § 1903(2).)

Section 306 permits a social worker to take a child into temporary custody "without a warrant" in emergency situations, namely, when "the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety." (§ 306, subd. (a)(2).) Peace officers may also take children into temporary custody without a warrant when similar exigent circumstances exist (§§ 305, 305.6, subd. (a)), and section 306 also permits the social worker to take temporary custody of a child "who has been delivered by a peace officer." (§ 306, subd. (a)(1).)

By contrast, section 340 provides for the issuance of protective custody warrants, and on a weaker showing than is required for a warrantless detention under section 306. (§ 340, subd. (b)(2); *Robert F.*, *supra*, 90 Cal.App.5th at p. 501, review granted; *Ja.O.*,

10

*supra*, 91 Cal.App.5th at p. 678, review granted; *In re Adrian L.*, *supra*, 86 Cal.App.5th at p. 357 (conc. opn. of Kelley, J.).) Specifically, section 340 authorizes the juvenile court to issue protective custody warrants when a section 300 petition has been filed and "the circumstances of [the minor's] home environment may endanger the health, person, or welfare of the minor, or whenever a dependent minor has run away from his or her court-ordered placement." (§ 340, subd. (a).) A court may also issue a protective custody warrant without a section 300 petition. (§ 340, subd. (b).) "[S]ection 340 requires neither imminent danger nor the threat of physical harm for the court to issue a warrant." (*Robert F.*, *supra*, at p. 501, review granted.)

The language of section 224.2, subdivision (b), is clear. It plainly states: "If a child is placed into the temporary custody of a county welfare department *pursuant to [s]ection 306* . . . the county welfare department . . . has a duty to inquire whether that child is an Indian child." (§ 224, subd. (b), italics added.) As we explained in detail in *Robert F.*, the legislative history supports the view that the Legislature intended to apply section 224.2, subdivision (b), narrowly. (See *Robert F.*, *supra*, 90 Cal.App.5th at pp. 500-504, review granted.) "The Legislature intended to impose a duty to question extended family members if the child was placed into the county welfare department's temporary custody under section 306." (*Id.* at p. 500.)

In this case, the child was taken into protective custody pursuant to a warrant under section 340, so she was not taken into temporary custody pursuant to section 306. The expanded duty of initial inquiry under subdivision (b) of section 224.2 therefore does

11

not apply. Mother's argument that CFS failed to discharge its duty of initial inquiry as to extended family members consequently lacks merit.

Our interpretation of section 224.2 does not exclude children removed pursuant to warrants from ICWA inquiry. Rather, it excludes such children from the *expanded* duty of initial inquiry under subdivision (b) of section 224.2. Such children are still subject to the duty of initial inquiry under subdivisions (a) and (c) of section 224.2. They are also subject to the duty of further inquiry under subdivision (e) of section 224.2 if there is reason to believe they are Indian children. Our interpretation of the statute merely limits the expanded duty of initial inquiry under subdivision (b) of section 224.2 to the children to whom the Legislature said it applies, in keeping with relevant federal guidelines. (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 502-503, review granted; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 680-681, review granted.)

We acknowledge that another panel of this court has declined to follow *Robert F.* (*In re Delila D.* (2023) 93 Cal.App.5th 953, review granted Sept. 27, 2023, S281447), and the California Supreme Court has granted review to decide the issue. Mother urges us to follow *Delila D.* For the reasons recently explained in *In re Andres R.*, *supra*, 94 Cal.App.5th 828 review granted, we continue to agree with *Robert F.* and *Ja.O.*, and we are not persuaded by the criticisms of *Robert F.* that were expressed in *Delila D.* (The majority opinion in *Delila D.* never cites *Ja.O.* and does not address its analysis.)

Even if we find section 224.2, subdivision (b) applies in this case, we find any error to be harmless. Because a juvenile court's ICWA error is one of state law, it is

12

reversible only if shown to be prejudicial. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742, citing Cal. Const., art. VI, § 13.)[4] In *Benjamin M.*, we concluded that "a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, at p. 744.) "This 'does not require "proof of an actual outcome (that the parent may actually have Indian heritage)." [Citation.] The missing information need only be relevant to the ICWA inquiry, "whatever the outcome will be."' [Citations.]" (*In re D.B.* (2022) 87 Cal.App.5th 239, 245.)

On the record before us, there is no reason to believe there is readily obtainable information that is likely to bear meaningfully on whether the child has Indian ancestry under the *Benjamin M.* analysis. In *Benjamin M.*, like here, the mother denied Indian ancestry. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 740.) Thus, in *Benjamin M.* we were concerned only with the possibility of Indian ancestry on Benjamin's paternal side. In *Benjamin M.*, the department could not locate Benjamin's father and did not obtain any information about Native American ancestry from the child's paternal side. Yet, the agency failed to conduct ICWA inquiries with the father's available brother and sister-in-law. We held that, because this "readily obtainable information" from the father's two

---

[4] We acknowledge that the Courts of Appeal are divided on how to review ICWA inquiry errors and that our Supreme Court is poised to resolve the issue. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611; *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779-782, review granted Sept. 21, 2022, S275578.) Until the court does so, we will apply this court's decision in *Benjamin M.*

relatives was "likely to bear meaningfully upon" the child's Native American status, where the agency had no information about the child's paternal side's ancestry, the error was prejudicial. (*Benjamin M.*, *supra*, at p. 744.)

In adopting this approach, we cited three cases in which readily obtainable information was likely to "shed meaningful light" on the ICWA inquiry. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) In each of those cases, the department either (1) failed to ask a parent about Native American ancestry or (2) failed to ask available extended family members who had been identified as likely having Native American ancestry or as having information about such ancestry. (See *In re N.G.* (2018) 27 Cal.App.5th 474, 482 [reversal required where agency never asked the mother whether the child may have maternal Native American ancestry and never asked her to complete a parental notification of Native American status form, despite being in contact with her]; *In re K.R.* (2018) 20 Cal.App.5th 701, 707-708 [reversal required where it was "likely that the paternal grandfather would have had some information about his father's [Native American] heritage," where paternal great-grandfather was "'the other relative with purported Cherokee heritage,'" and there was no evidence that the agency "attempted to contact the living great-grandmother in order to determine whether she had any relevant information"]; *In re J.N.* (2006) 138 Cal.App.4th 450, 461 [error not harmless where it was "apparent from the record that mother was never asked whether she had any [Native American] ancestry" despite appearing before the court].])

14

Mother claims that several extended family members, such as maternal cousins C.C. and T.C., maternal great uncles R.G.R. and L.R., and paternal uncle A.R., were not interviewed as to their Native American ancestry.[5]  Applying *Benjamin M.*, we conclude the record before us demonstrates that any readily obtainable information from maternal cousins C.C. and T.C. and paternal uncle A.R. was unlikely to shed meaningful light on the child's ICWA status.  (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)  Here, and unlike two of the cases relied on by us in *Benjamin M.* and our decision in *Benjamin M.*, Mother and Father unequivocally denied any Native American ancestry.  (Cf.  *In re J.N.*, *supra*, 138 Cal.App.4th at p. 461 [the mother available but never asked about Native American ancestry]; *In re N.G.*, *supra*, 27 Cal.App.5th at p. 482 [same]; *Benjamin M.*, *supra*, at p. 744 [the father unavailable and could not be asked about Native American ancestry].)

Further, we are offered no reason in the record to believe that maternal cousins C.C. and T.C. and paternal uncle A.R. would have better information about the child's ancestry than Mother, Father, and the other numerous relatives did.  Mother, Father and all of the maternal and paternal relatives with the exception of maternal great uncle L.R.

---

[5]  We note that Mr. C., T.C., and T.Q. appear to be the same person – a maternal cousin.  In addition, the record indicates that maternal great uncles R.G.R. and L.R. were contacted regarding their Native American ancestry and that L.R. claimed possible Indian heritage through the maternal great-great grandmother but that he was "unsure" and did not know the tribe.  It also appears that maternal great uncle "R.R." is the same person as "R.G.R."  Great uncles are not extended relatives as defined by the ICWA.  Nonetheless, maternal uncle R.R. denied Indian ancestry in the ICWA-010 form attached to the original petition.

denied Native American ancestry. (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015 ["All of the parents appear to have been in contact with their extended families, and thus the possibility that they might unknowingly be members of a tribe appears trivially small."].) R.R., the daughter of C.C., also denied Native American ancestry. Furthermore, maternal cousin C.C. had adopted the child's sibling and no sibling was found to be an Indian child. Moreover, the child is placed with her maternal cousin T.A.-B. and her husband who are also the child's prospective adoptive parents.

In addition, Indian ancestry was not at issue in Mother's prior dependency cases. Given the repeated significance of the issue to her parental rights, we expect Mother would have asked her relatives with whom she had contact about Indian heritage. This is also true as to Father. However, after multiple prior dependency cases, Mother and Father still "have no Indian ancestry as far as [they] know."

Finally, maternal great uncle L.R.'s statement that maternal great-great grandmother told him that the family had Indian ancestry but that he was "unsure" was insufficient to trigger further inquiry under section 224.2, subdivision (e). A duty of further inquiry arises when the social service agency or the juvenile court has "reason to believe" the proceedings involve an Indian child but "does not have sufficient information to determine that there is reason to know that the child is an Indian child." (§ 224.2, subd. (e).) As clarified by the Legislature, a "reason to believe" exists when the court or the social service agency "has information suggesting that either the parent of the

16

child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

Here, maternal great uncle L.R. stated that he was "unsure" as to the maternal great-great grandmother's claim regarding familial Native American ancestry and he could not identify a tribe or a location of a tribe. Certainly, Mother has made no offer of proof that the child is an Indian child. Given the absence of any evidence or claim that the child might have Indian ancestry through a tribe, Mother's "unvarnished contention that additional interviews of [the maternal cousins C.C. and T.C. and paternal uncle A.R.] would have meaningfully elucidated [the child's] Indian ancestry" does not support a finding of prejudice. (*In re Darian R.*, *supra*, 75 Cal.App.5th at p. 510; see *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053 ["no further inquiry was needed because there was no further information of value to obtain"].)

In *In re I.F.* (2022) 77 Cal.App.5th 152 is instructive. In that case, the mother claimed she had been told by the maternal grandfather (her father) that she had Indian ancestry through the child's maternal great-grandfather, and the child's maternal grandfather confirmed that his father told him the family had Indian ancestry in Minnesota. (*Id*. at pp. 157, 159-160.) Under these circumstances, the appellate court found that the duty of further inquiry was triggered based upon a "reason to believe" the children were Indian children. (*Id*. at p. 164.) Therefore, upon remand the department was required to gather biological information related to the maternal great-grandfather

17

and provide the information to the BIA and the federally recognized tribes in Minnesota. (*Id.* at p. 166.)

In this case, there was no such evidence. L.R. never indicated a tribe or a location of a tribe. Moreover, L.R. further stated that he was "unsure" whether the family had Native American ancestry. We disagree with Mother's appellate counsel's interpretation of L.R.'s statements to the social worker concerning the family's Indian ancestry. During oral argument, Mother's appellate counsel appeared to argue that L.R. was "sure" about the maternal great great-grandmother's claim of Native American ancestry, but "unsure" as to what tribe. The record specifically states that L.R. "was told by the maternal great great grandmother, [P.R.,]" "that the family had Native American Ancestry (tribe unknown), however, he further stated that he is unsure." Our interpretation of L.R.'s statements is that L.R. was "unsure" as to the maternal great great-grandmother's claim of Native American ancestry, as well as the tribe being unknown. The information that the juvenile court received was, at best, speculative family folklore and insufficient to trigger further inquiry.

In any event, CFS continued to inquire of both paternal and maternal relatives concerning the child's Native American ancestry and sent ICWA inquiry letters to the BIA. The required further inquiry includes interviewing the parents and extended family members to gather the information necessary for an ICWA notice, contacting the BIA and State Department of Social Services to gather the names and contact information of the pertinent tribes, contacting the tribes, and contacting any other person who may

18

reasonably be expected to have information regarding the child's membership status or eligibility. (§ 224.2, subd. (e)(2)(A)-(C).)

There is no evidence here that any living relatives with knowledge of Mother's possible Indian ancestry were available for CFS to interview. The maternal great-great grandmother was deceased, as was the maternal grandmother, the maternal great grandmother, the maternal great grandfather, and the maternal great-great grandfather. There were no other family members identified that could provide additional information. CFS had already inquired of at least nine relatives with all, except L.R.'s speculative statement, denying Indian ancestry. Certainly, paternal uncle A.R. would not have such information, even if he was readily available to be contacted while in custody at WVDC. Moreover, there was no tribe to contact because no tribe was identified. Nevertheless, CFS sent letters by certified mail to both the national office and Pacific regional office of the BIA on September 13, 2023, and October 20, 2023, respectively. The letters included the known information about the maternal great-great grandmother, the parents, and the child.

While it is well established that the "duty to develop information concerning whether a child is an Indian child rests with the court and the [agency], not the parents or members of the parents' families" (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 430), the court and agency often cannot satisfy this duty without participation from the parents. CFS did not have contact information for maternal cousin T.C. or paternal uncle A.R. And though CFS was aware, based on statements made by A.R.'s girlfriend, that A.R.

19

was in custody at "WVDC" at some point during the dependency, it is unknown whether A.R. was still in custody at WVDC or that A.R. would have readily obtainable information likely to "shed meaningful light" on the ICWA inquiry. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) CFS attempted to reach Father to get updated information, but he did not respond. Mother had moved to Arkansas, did not provide accurate updated contact information and was only intermittently responsive to CFS. Given that all persons that had information about maternal great uncle L.R.'s claim of possible Indian ancestry were deceased, CFS had no additional leads to pursue.

In the present case, CFS had no duty to locate or interview maternal relatives without knowledge that available maternal relatives had meaningful information regarding claimed Indian ancestry. (See, e.g., *In re Michael V.* (2016) 3 Cal.App.5th 225, 235 [agency made no effort to locate and interview children's maternal grandmother "even though it was she who reportedly had the direct link to a tribe"].) "ICWA does not obligate the court or [agency] 'to cast about' for investigative leads. [Citation.] There is no need for further inquiry if no one has offered information that would give the court or [agency] reason to believe that a child might be an Indian child. This includes circumstances where parents 'fail[ ] to provide any information requiring followup' [citations], or if the persons who might have additional information are deceased [citation], or refuse to talk to [the agency]." (*In re A.M.*, *supra*, 47 Cal.App.5th at p. 323.) "[T]he obligation is only one of inquiry and not an absolute duty to ascertain or

20

refute Native American ancestry." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413.)

Accordingly, on this record, we cannot say that specific inquiry of the three extended family members identified by Mother was likely to shed meaningful light on the child's ICWA status. For all of the foregoing reasons, we conclude that Mother has not shown ICWA error by either CFS or the juvenile court.

IV.

DISPOSITION

The juvenile court's order terminating parental rights over P.M. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

I concur:

FIELDS
J.

[*In re P.M.,* E082577]

McKINSTER, Acting P. J., Concurring.

    I agree with the majority that any error is harmless.  (Maj. opn., *ante*, at p. 12 et.

seq.)  On that basis, I concur in the judgment.


                                    McKINSTER
                                      Acting P. J.